IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| DALE E. WHIPPLE,<br><br>        Plaintiff,<br><br>   v.<br><br>STATE OF UTAH, et al.,<br><br>        Defendants. | Case No. 2:10-CV-811-DAK<br><br><br>**REPORT AND RECOMMENDATION**<br>Magistrate Judge Samuel Alba |

Before the court are several motions: (1) a motion to dismiss filed by Defendants Utah.com, LC ("Utah.com") and Ryan Kirby (collectively "Utah.com Defendants") pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure (Doc. 6); (2) a motion to dismiss filed by Defendants Utah Office of Tourism and Leigh van der Esch, and joined by Defendant State of Utah (collectively "Utah Tourism Defendants"), pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure (Docs. 9, 23); and (3) a motion to dismiss and/or for summary judgment filed by Defendants Millard County, Millard County Tourism Committee, Richard Waddingham, LeRay Jackson, Daron Smith, Kathy Walker, John Cooper, Craig Greathouse, Debra Haveron, Dick Flones, Roger Killpack, Evelyn Warnick, Don

Fullmer, Gayle Cluff, Tonya Quackenbush, and Linda Gillmore (collectively "Millard County Defendants") (Doc. 32).

Having carefully reviewed the parties' pleadings and the record in this case, and having heard oral arguments on Defendants' motions to dismiss and for summary judgment, the court recommends that all three of Defendants' motions be granted, and that this case be dismissed.

## BACKGROUND[1]

When considering a motion to dismiss for failure to state a claim upon which relief may be granted, *see* Fed. R. Civ. P. 12(b)(6), the court should "assume the [factual] allegations are true." *Christy Sports, LLC v. Deer Valley Resort Co., Ltd.*, 555 F.3d 1188, 1191 (10th Cir. 2009). In reviewing a motion for summary judgment, the court views the evidence in the light most favorable to the non-moving party. *See Skrzypczak v. Roman Catholic Diocese of Tulsa*, 611 F.3d 1238, 1243 (10th Cir. 2010).

In 1983, Millard County sent its Transit Room Tax receipts ("TRT") to "Panoramaland," then the Utah Office of Tourism's official six-county travel region for central Utah. (Doc. 1, at 6.) That same year, Plaintiff developed his own tourism plan "hoping it would develop into a source of much-needed revenue," presented that plan to the Millard County Commission and

---

[1]The court notes that Plaintiff's complaint contains a 106-page "Timeline of Events" (Doc. 1, at 6-112) and that the court will not include all of Plaintiff's factual allegations in this Report and Recommendation.

Panoramaland, and provided evidence showing that Millard County's contribution of its TRT funds to Panoramaland was counterproductive. (*Id.*, at 6-7.)

In July 1984, Plaintiff independently published the first edition of a publication he entitled *Discovering Millard County* ("DMC"), "with no involvement by Millard County." (*Id.* at 7.) DMC was printed on newsprint and given away as a free newspaper insert. (*Id.*) Plaintiff also distributed DMC through local business and visitors centers in Fillmore and Delta, Utah. (*Id.*)

Millard County withdrew from its participation in Panoramaland. In October 1984, the Millard County Commission began developing a tourism program and appointed Glen Swalberg to organize the Millard County Tourism Committee ("MCTC").[2] (*Id.*) In August 1986, Chairman Swalberg asked Plaintiff to provide copies of DMC for information packets being sent out by local chambers of commerce. (*Id.*) Plaintiff agreed, contingent upon Millard County paying for the extra costs of printing. (*Id.*) Plaintiff did not "markup" the printing costs, but did a "straight-through pass-along of the exact cost of printing." (*Id.*)

Over the next 6 years, Plaintiff continued to publish and distribute DMC, occasionally making minor changes such as adding

---

[2]The court notes that the MCTC is organized pursuant to Utah Code Ann. § 17-31-8; pursuant to subsection five of that statute, its members are not compensated for their time and service on the committee, *see id.* § 17-31-8(5)(a). (Doc. 33, at 6.)

"spot-colors of ink" and "full-color photos" at the request of the MCTC, with the MCTC paying for the extra printing costs. (*Id.* at 7-8.) For example, in 1992, the MCTC requested that full-color photographs be added to DMC, agreeing to pay the cost increase (*id.* at 8).

In August 1992, Plaintiff met with Swalberg and Millard County Commissioner Overson "to work out an agreement concerning DMC." (*Id.*) Before that time, DMC "paid the printing costs for only those copies that *they* distributed in information packets, or at trade shows or fairs, and they paid for color separations of photos that *they* requested"; however, based on the increased distribution of DMC, it "no longer made sense" to track the photos and copies separately. As a result, the MCTC and Plaintiff entered into a "new cooperative agreement," *id.* (emphasis in original). That agreement included the following details:

> a. The MCTC would provide budgeted funds in "advance to pay the cost of printing" for all copies of the DMC, and would reimburse for certain shipping costs;
>
> b. Plaintiff "would bear *all* production costs";
>
> c. The MCTC would "provide letters of official support, urging local businesses and other concerned interests to advertise in DMC"; and
>
> d. The MCTC "would provide storage space and assist in distribution as requested by the Plaintiff, but the bulk of the distribution would be done by the Plaintiff. Local

> Chambers of Commerce would stockpile and
> distribute copies of DMC at their visitor
> centers, and serve as depots for local
> businesses and event organizers to draw
> from."

(*Id.* at 8-9.)

In 1993, the MCTC received a request from another journalist to present a competitive bid for the tourism publication, and the MCTC purchased a tourism magazine from the Millard County Chronicle rather than DMC. In the meantime, Plaintiff continued publishing DMC without Millard County funding and "maintaining his commitments to his advertisers to *publish annually*." (*Id.* at 9 (emphasis in original).) After conducting a poll of businesses indicating on overwhelming preference for DMC, the MCTC again asked Plaintiff if "DMC can become the *official tourism publication* for the County." (*Id.* (emphasis in original).) Plaintiff agreed, "contingent upon the establishment of a *long-term agreement* being put into effect." (*Id.*) Plaintiff requested a written contract. The MCTC explained it could not do that as TRT funds that were used for DMC were different than the County's general budget funds; however, a "verbal agreement was made, fair consideration was given, and agreements were lived by for a decade and a half." (*Id.* at 10 (emphasis original).)

As set forth in Plaintiff's complaint, the terms of the "indefinite" long-term agreement included the following:

> 1. "Annual publishing of at least 10,000
> copies with the County paying for the cost of
> printing (in the same manner as in the past)

and certain shipping expenses (10,000 copies being the lowest number printed in the past)";

2. "Production expenses, other than printing and shipping, being paid for by the Plaintiff";

3. "Copyright, ownership, production design, and editorial control" being the Plaintiff's, with "[c]ontent suggestions [being] welcome from MCTC members, advertisers, and *all* other concerned citizens," but only incorporated into DMC "as space and time allow, as determined by the Plaintiff";

4. "Distribution [would be] the responsibility and the right of Plaintiff, but Plaintiff [would] coordinate and confer with the MCTC, Chambers of Commerce, and *all* other interested parties to be sure distribution [was] being done in the best manner possible. Plaintiff [would] provide a distribution plan or report when requested – based on annual distribution of all copies printed" to "emphasize local and regional distribution in a manner that would assure that copies would remain available year-round, instead of months prior to reprinting where all supplies had already been exhausted";

5. "Other tourism projects of the Plaintiff's [would] be officially supported and startup costs provided from TRT money as well";

6. "Length of contract [would] be indefinite to allow the Plaintiff the time to prepare and publish the other tourism projects, and turn a profit," while "Millard County will receive *immediate* benefit and savings by the Plaintiff providing printed copies of DMC to be used as Millard County's official tourism publication at a greatly discounted rate over what it would have cost to have printed on their own." Plaintiff would have high initial expenses, which would be recouped,

and a profit eventually made, through other
tourism projects.

(*Id.* at 10-11 (emphasis in original).)  Thus, Plaintiff alleges

that he incurred production expenses for design and layout,

collected the tax revenue from Millard County, and sold

advertising.  (*Id.* at 10-11.)

In 1995, due to personal issues, Plaintiff unilaterally

placed DMC on hold without making any alternative plans for DMC.

Plaintiff resumed printing DMC in 1996.  (Doc. 1, at 11-12.)

Between 1995 and 2000, Millard County assumed storage and

distribution of DMC.  (*Id.*)

Over the next five years, the number of magazines ordered by

the MCTC increased and Millard County paid for, stored, and

distributed DMC.  (*Id.* at 12.)  In 2000, Plaintiff took over

storage of DMC.  (*Id.*)  The MCTC also asked that DMC be improved

and changed to booklet format.  (*Id.*)  The MCTC also increased

its order to 30,000 copies.  (*Id.*)

On March 14, 2001, Plaintiff made a presentation at a

regularly scheduled MCTC meeting and proposed that he be allowed

to expand the advertising in DMC, which would also allow him to

expand the size of DMC from 28 to 34 pages, and increase several

other proposed tourism-related magazines, maps, CD's, and a

website.  It was determined that Plaintiff was to report back to

the committee on the cost of printing 50,000 to 200,000 magazines

for the Olympics with a glossy cover, and report on the cost of

upgrading to a glossy cover by the next meeting. (Doc. 33, Ex. 10 (MCTC minutes), at 2-3.) The MCTC continued to participate in the State of Utah Panoramaland and pay for Panoramaland brochures. (*Id.* at 4.)

On April 11, 2001, the MCTC approved the purchase of 100,000 copies of a 32-page magazine. (Doc. 33, Ex. 11 (MCTC minutes).) On August 8, 2001, the MCTC noted the cost of 100,000 copies of DMC was $14,073.00. (Doc. 33, Ex. 12 (MCTC minutes), at 2.)

On March 13, 2002, the MCTC discussed the fact that DMC needed to be revised to make it more eye appealing and that they would invite Plaintiff to the next meeting to present ideas for changes to DMC. (Doc. 33, Ex. 13 (MCTC minutes), at 2.) On April 10, 2001, the MCTC asked Plaintiff to look into improving the quality of DMC. (Doc. 33, Ex. 14 (MCTC minutes), at 3.) On May 8, 2002, the MCTC approved $14,073.44 for a "new brochure on Discovering Millard County." (Doc. 33, Ex. 15 (MCTC minutes), at 2.)

In addition to discussing the DMC and www.discoveringmillardcounty.com, Plaintiff's complaint also details numerous interactions between himself, members of the MCTC, and County Commissioners and other third parties, over the course of the last decade or so, concerning Plaintiff's involvement in other tourism projects for Millard County, including Plaintiff's preparation of photographs, maps, brochures, postcards, and the like. (Doc. 1, at 12-109.)

In approximately May 2002, Plaintiff "update[d] [the] MCTC on how www.discoveringmillardcounty.com [was] progressing."  The MCTC "expresse[d] concern about the lack of quality of the County's website, www.millardcounty.com," and Plaintiff informed the MCTC he was "willing to see if there [was] something he [could] do to improve www.millardcounty.com."  (Doc. 1, at 17.)

According to Plaintiff's complaint, at a July 10, 2002 MCTC meeting, "Utah.com request[ed] MCTC's participation on their web page, the official web page for the Utah Travel Council," and the MCTC "approved to link www.millardcounty.com to www.utah.com" for $600 a year.  (Doc. 1, at 18.)

On September 11, 2002, Plaintiff reported to the committee that the printer had made an error in printing DMC, but had reduced the cost to five cents for 50,000 copies of a 48-page booklet.  (Doc. 1, at 19; Doc. 33, Ex. 16 (MCTC minutes), at 3.)[3]

Plaintiff continued to update the MCTC on the progress of www.discoveringmillardcounty.com during February and April of 2003, (Doc. 1, at 20-21), and in response to questions about why Millard County needed two websites, www.millardcounty.com and www.discoveringmillardcounty.com, the MCTC Chairman responded that www.discoveringmillardcounty.com was the Plaintiff's website

---

[3]The court notes that it appears from the MCTC minutes that Plaintiff did not reimburse Millard County for this reduction in cost.  (Doc. 33, Ex. 17 (MCTC minutes).)

and would simply be linked to the county's website at no charge, (Doc. 1, at 21.)

According to Plaintiff's complaint, in approximately April 2003, certain members of the MCTC and/or Millard County Commissioners (or individuals who would become members of the MCTC or County Commissioners and replace former members/Commissioners) began a "takeover of tourism" and decided to make "new changes of direction for tourism." (Doc. 1, at 21, 22, 23 (alleging County Commission as of 2003 was "now intent on restructuring and seizing control of all-things tourism-related").

In July of 2003, at an MCTC meeting, Commissioner Daron Smith informed the MCTC that he was still working on a website agreement for the county's www.millardcounty.com website, and the MCTC chairman complimented Plaintiff on his new www.discoveringmillardcounty.com website, then online. Plaintiff also indicated that he had been working on www.webnet.com, a project intended to connect the public and private sectors, including www.millardcounty.com and www.discoveringmillardcounty.com, along with other businesses, all at no charge. (*Id.* at 23-24.)

On July 9, 2003, the MCTC agreed to a reprint of DMC and paid $8,091.84 for 20,000 copies, including the cost of printing, shipping, distribution, and storage. (Doc. 33, Ex. 19 (Millard Publishing Invoice for reprint of DMC and Copy of Check Issued to

Millard Publishing), at 2-3.)  On September 10, 2003, the MCTC distributed DMC at the International Sportsman's Exposition in Sandy, Utah.  (Doc. 33, Ex. 18 (MCTC minutes), at 3.)

On February 11, 2004, the MCTC agreed to order 36,000 copies of DMC for $17,640.  There was no discussion regarding early payment.  (Doc. 33, Ex. 20 (MCTC minutes), at 5-6.)  Plaintiff invoiced Millard County on April 8, 2004.  (Doc. 1, at 27-28.)

At a regularly scheduled MCTC meeting on March 9, 2005, Plaintiff informed the committee that distribution of DMC should be undertaken by Millard County or the motel owners, as distribution was difficult for him and his staff due to health issues.  (Doc. 33, Ex. 21 (MCTC minutes), at 4-5.)  Plaintiff stated that he didn't believe it mattered how copies of DMC were distributed as long as they were available.  (*Id.* at 5.)  He also said that the county had "bought" copies of DMC for a particular price.  (*Id.*)

In April of 2004, the MCTC discussed how to manage its www.millardcounty.com website.  Its designer, who attended the meeting, suggested that Plaintiff be given the opportunity to improve, develop, and tie it in with Plaintiff's www.discoveringmillardcounty.com and www.millardcountywebnet.com websites.  After this suggestion, there was "consensus that the plaintiff would do a good job" and the MCTC "authorized him to work out the details and take that website over."  (Doc. 1, at 28.)

In March of 2005, the MCTC and county commissioners debated about linking Plaintiff's websites with the www.millardcounty.com website.  (*Id.* at 33.)

On April 13, 2005, the MCTC informed Plaintiff and others, including Shellie Dutson of the Millard County Chronicle, that they would accept bids for the next Millard County tourism magazine.  (Doc. 33, Ex. 22 (MCTC minutes).)  Plaintiff became upset at the bidding proposal, so the MCTC explained that pursuant to the State Tourism Board and the county's purchasing policy, all applicants for TRT revenue were required to submit a bid and enter into a purchase agreement for the product or event and that DMC was a "product."  (Doc. 33, Ex. 22, at 7-9.)  At that meeting, Plaintiff noted that DMC was good "continuously" because it was not dated - only the ads changed from year to year - allowing him to reprint the same magazine annually.  (*Id.*)

MCTC began exploring the possibility of Millard County self-promoting and producing a Millard County tourism publication containing no advertising.  Millard County requested proposals for the Millard County Tourism website and in December 2005, it awarded the project to Utah.com.  (Doc. 1, at 56.)

On May 11, 2005, Plaintiff again attended the MCTC regularly scheduled meeting and apologized for getting angry at the previous meeting.  Plaintiff acknowledged Millard County had the right to bid out the tourism magazine.  (Doc. 33, Ex. 23 (MCTC minutes), at 3.)

At a July 13, 2005 MCTC meeting, in discussing the county website, County Commissioner Kathy Walker "said that Utah.com is a great place to have a link," that she was aware of another website and another individual who wanted to "do a presentation because they set up county web sites." (*Id.* at 42.)

At the same meeting, Plaintiff and the MCTC discussed why Millard County had pulled their advertising from DMC, with Plaintiff stating that he obtained his profit from the advertising. Plaintiff said that advertising was a separate issue from buying copies, and without advertising, the cost of the magazine would go up. (Doc. 33, Ex. 24 (MCTC minutes), at 3.) The committee stated that the undated magazine was confusing; people had no idea for what year it was advertising. Plaintiff asked for a letter of support from the committee to facilitate his sell of advertising and was informed that the local government could not encourage business to advertise with one private enterprise over another. (*Id.* at 4.) Plaintiff asked if the committee would be offended if he changed the pricing structure on the next magazine. The committee reminded Plaintiff that the magazine had already been paid for and the following year Millard County would be looking at other options. (*Id.*) Plaintiff asked if he should plan to publish DMC in 2006, and he was told that was entirely up to him, but Millard County would not guarantee that it would buy any copies in 2006. (*Id.* at 5.)

Plaintiff attended the August 8, 2005 County Commission meeting to discuss the future of DMC.  (Doc. 1, at 43.) Plaintiff made accusations against Commissioner Walker.  One of the commissioners assured Plaintiff that the county would not compete with DMC.  (*Id.*)

At a September 14, 2005 MCTC meeting, the County Commissioners discussed that www.millardcounty.org was the only official county website, that www.millardcounty.com would no longer be an official website, and that an outside source should be considered to professionally build a new tourism website. (*Id.* at 45.)

According to Plaintiff's complaint, at an October 12, 2005 MCTC meeting where Plaintiff was not in attendance, Defendant Kirby of Utah.com appeared and explained that "Utah.com started with a partnership with the travel council," indicated that Utah.com also built websites, and said that "www.millardcounty.org will never show up in a search engine." (*Id.* at 46.)

Kirby allegedly provided an estimate of $5,000-$10,000 to build a website, and indicated that "it might be good to put it out for bid and see if there are other people that can do a better job. www.utah.com is probably not the cheapest, but [Kirby] could come down and *architect it and then put it into a bid* for a website."  (*Id.* at 47 (emphasis original).)  In his complaint, Plaintiff offers his own commentary that "[i]f a

14

potential bidder becomes the 'architect' of the specifications, doesn't that allow him the opportunity to engineer the bid in such a way that it places his own company in the best position to win that bid? And wouldn't that be unfair competition?" (*Id.*)

The MCTC then discussed meeting with Kirby to get a "*skeleton plan* to present to the committee and get it put out for bid," that maybe Kirby "could help with the slogan," and that the website could get going quickly, but that Kirby "*just needs direction.*" (*Id.* at 47 (emphasis in original).)

On approximately November 23, 2005, Millard County published a Request for Proposals ("RFP") in the Millard County Chronicle Progress for a tourism website. (Doc. 33, Ex. 26.) Plaintiff presented the county with his proposal, which included the threat of legal action should the county select a bid other than Plaintiff's, even including excerpts from legal treatises regarding breach of contract and proposed legislation on unfair competition. (*Id.*) The MCTC met on December 14, 2005, and did not select Plaintiff's bid. (Doc. 33, Ex. 27 (MCTC minutes), at 1.)

Plaintiff details a November 27, 2005 conversation he had with MCTC member Dick Flones, wherein in discussing bids that have gone out for the county website, Mr. Flones told Plaintiff, "The RFP is not being done in a vacuum. You have a Vice President of Utah.com working on it. They probably won't even bid on it. They've worked on three-quarters of the county

15

websites in the state.  They're quasi-governmental. They don't want to bid on it.  They want to bid it out to someone else." (Doc. 1, at 51.)  Plaintiff adds, as his commentary regarding these these statements:  "This of course makes no sense.  How could the RFP for the website be sent out in the last week of November for a December 15 bid opening and awarding, and have the website completed by December 31 unless the fix was in on who was going to do the work, and a lot of work that had already been done in advance?  Apparently the important thing for Utah.com was to make it look like they didn't want the bid, but create the specs and the timetable in such a way that only Utah.com could fulfill the bid request – a formula that could indeed win three-quarters of the counties['] tourism websites in a cunning and clever manner." (*Id.*)

On November 29, 2005, Plaintiff called the MCTC chairman "and complained that he had not received an RFP for the County's new website," after which the chairman "personally dropped one off at the Plaintiff's home because the bidding period was almost over."  (*Id.* at 52.)  Plaintiff alleges that this was "just a smokescreen" because "MCTC already knew the website would be awarded to Utah.com."  Plaintiff alleges he was "so convinced that the bidding was rigged" that he asked his son to participate in the bidding process.  (*Id.* at 52.)

Plaintiff's son asked a contact who built websites to "prepare a bid at a greatly discounted price, as a favor to him," and asserts that the website company noticed "that the specs in the bid were outmoded and called for using the HTML language in a way that wasn't being done anymore," making the Salt Lake Company "wonder if the bid was rigged." (*Id.*) Plaintiff also bid on the job at $0, and "reminded the County that he had been working for free all the way along and had the website development well underway already, having invested thousands of dollars in it." (*Id.*)

At a December 14, 2005 MCTC meeting, an MCTC member "handed out the comparisons on the bid, and stated that the website committee felt that the county should go with the Utah.com bid. It most closely fit what the committee [was] looking for." (*Id.* at 55-56.) Plaintiff includes his commentary that "[s]ince Ryan Kirby wrote the specs for the RFP, it would only make sense that he would come the closest to matching his own specs." (*Id.*)

According to the allegations, an MCTC member "stated that he felt that [Plaintiff's] proposal wasn't a bid, but a threat." (*Id.* at 56.) Another member "asked why the County couldn't use both Utah.com and [Plaintiff]," concerned that "there would be a lawsuit, and then the website would be tied up in litigation." (*Id.* at 56.) The chairman responded that he had spoken with Plaintiff, and that Plaintiff "has stated that he is going to pursue his own website, and as long as the County has links back

and forth with his website, [he thought Plaintiff would] be okay." (*Id.* at 56.)

At a January 11, 2006 MCTC meeting, the chairman indicated that he was "pleased with the website designed by Utah.com," the Plaintiff provided progress updates on his www.millardcountywebnet.com website, and the chairman said "the Tourism Website would definitely like to link to it." (*Id.* at 57.)

On April 12, 2006, MCTC approved the printing of 45,000 copies of DMC. (Doc. 33, Ex. 28 (MCTC minutes), at 4.) The parties executed a purchase agreement designating Plaintiff as a sole source provider of DMC. (Doc. 33, Ex. 6 (4-12-06 Invoice for $24,700.00, Copy of Check, & 4-21-06 Agreement (stating "[t]he purchase upon which this agreement is based is made from a single source provider which has been determined and documented"); Doc. 33, Ex. 8 (Additional Purchase Agreements for Various Other Brochures and Magazines Published by Plaintiff).)

On September 13, 2006, Plaintiff bid to publish Millard County's Notch Peak Loop Brochure. (Doc. 33, Ex. 29 (invoice, bid purchase agreement).) The deadline to produce the brochure was October 31, 2006 (*id.*), but it was not timely produced (Doc. 1 at 64). Plaintiff's agreement included distribution of the brochure. (Doc. 33, Ex. 30 (2-21-07 MCTC minutes), at 4-5 & Ex. 5 (3-14-07 MCTC minutes), at 4.)

In approximately January 2007, Millard County hired Linda
Gillmore to be its new Tourism Director. (Doc. 1, at 64.)
During a regularly scheduled MCTC meeting held February 21, 2007,
Gillmore reported that she had met with Leigh van der Esch a few
times and provided her with information about where Millard
County was going with its tourism program. (Doc. 1, at 64, 65.)

These events began to culminate in approximately 2007, when
at a March 14, 2007 MCTC meeting, Plaintiff suggested that he
would publish 45,000 copies of the DMC for the 2008 year, while
the MCTC chairman indicated that the MCTC might not pay for any
additional costs during 2008. (*Id.* at 65-66.) After some
discussion, the MCTC ultimately decided it would pay to reprint
40,000 copies of the DMC. (*Id.* at 66.) County Commissioner
Kathy Walker further indicated that she wanted the MCTC to take
over distribution, but the ultimate decision made was that
Plaintiff would "continue doing the distribution as usual." (*Id.*
at 66-67.)

On March 21, 2007, Plaintiff sent an email to von der Esch
explaining what he had "been going through and the apparent
attempt to take over tourism and his publication, and requesting
a time to meet." Plaintiff asked von der Esch "for her help in
solving the problems with Linda Gillmore and Commissioner
Walker." (Doc. 1, at 73.) On March 22, 2007, Plaintiff sent an
email to von der Esch "stating that the meeting with Commissioner
Walker had gone better than expected and that he may not be

needing to meet with her after all." Plaintiff wrote in his email that "[w]e may have resolved the misunderstanding, and all may be well. I will get back with you at a later time if need be." (Doc. 1, at 76.) Plaintiff surmises in his complaint that "[t]he fact that Millard County was following the policies other counties were using suggests that Leigh van der Esch's training was being followed." (Doc. 1, at 75.)

Around this time, Plaintiff was informed that Millard County would no longer be paying in advance for printing costs of DMC, and again indicated that it may be stockpiling what had already been produced and putting off new printing until the next season or the following year. (*Id.* at 72.)

On March 27, 2007, Plaintiff sent an invoice in the amount of $24,800 to the county "for the printing of 40,000 copies of DMC" with the description indicating a "Sponsorship of Discovering Millard County. QTY: 40,000 48 page, full color. No shipping costs." (*Id.* at 76.)

On April 3, 2007, the County Commission approved DMC in a process Plaintiff asserts was "excruciatingly painful," "embarrass[ing] and demoraliz[ing]," causing Plaintiff to inform the Chairman of the MCTC that Plaintiff "will distribute the current edition of DMC as agreed upon for this year," but that the following year, he would "turn DMC into a 3-County publication that won't involve the MCTC or County Commission." (*Id.* at 77.) Plaintiff sent the DMC off to be printed on April

5, 2007, and received payment of the printing costs from the county on April 17, 2007. (*Id.* at 79, 82.)

On April 11, 2007, the MCTC approved a reprinting of 40,000 copies of DMC (previously approved on April 12, 2006), leaving a total of 60,000 copies in stock, 20,000 from the 2006 order, and 40,000 from the 2007 order. (Doc. 33, Ex. 31 (MCTC minutes).) The committee noted that Plaintiff was again requesting a long-term commitment to order a minimum number of copies of DMC, but the board agreed it was unable to guarantee or commit the expenditure of future taxes on specific tourism products. (*Id.*) Plaintiff again threatened the county with discontinuing his publication of DMC and instead publishing a three-county tourism magazine. (*Id.* at 6; Doc. 1, at 77, 81.) On April 16, 2007, payment in the amount of $24,800.00 was issued for the 2007 reprinting of DMC. (Doc. 33, Ex. 6.)

On April 17, 2007, Plaintiff met with von der Esch at her office on Capitol Hill to ask for help concerning Gillmore. (Doc. 1, at 82.) During the meeting, Plaintiff explained to von der Esch that "Millard County, the MCTC, and her employee Linda Gillmore [were] trying to take over tourism in Millard County." (*Id.*) Plaintiff also explained "the history and how the agreements came about" and "the damage that [was] being done to his business." (*Id.*) Plaintiff told von der Esch that he was particularly upset by a comment by Gillmore that it was not her job to keep him in business. (*Id.*) Plaintiff explained that

Commissioner Kathy Walker and Gillmore were working as a team with the apparent goal of taking over DMC and all of the other tourism projects Plaintiff had been working on; von der Esch told Plaintiff that she would look into his concerns. (*Id.* at 83.)

Plaintiff alleges that around that time and during the coming months, members of the MCTC and County Commission held private, closed "work meetings" in violation of Utah's open meetings laws concerning decisions to be made about the distribution of DMC. (Doc. 1, at 83.)

During a regularly scheduled MCTC meeting held May 9, 2007, Gillmore reported that Plaintiff had followed through on his promise to call von der Esch, that von der Esch subsequently called and talked to Gillmore, and that von der Esch was going to work with Millard County. (Doc. 1, at 84.)

During the summer of 2007, Plaintiff and the MCTC began engaging in a debate/dialogue as to whether Plaintiff or the MCTC would/should control distribution of the printed copies of DMC that Millard County asserted it had paid for. (Doc. 1, at 86-92.) The MCTC discussed distribution problems with DMC at several MCTC meetings. (Doc. 33, Ex. 32 (8-8-07 MCTC minutes), at 9-12.)

At an August 8, 2007 MCTC meeting, the MCTC reported that it had made arrangements with a third party to distribute the DMC in the Fillmore area. (Doc. 1, at 86.) After discussion by those present about the MCTC's relationship with Plaintiff and the

22

distribution of DMC, the MCTC concluded that it had in fact purchased the 40,000 copies of DMC and could distribute them itself, and thereafter moved that the "county take possession of the 40,000 copies of the latest edition of DMC and have the county provide *distribution of the publication from this point forward*." (*Id.* at 88 (emphasis in original).) Plaintiff was contacted by telephone and asked to deliver DMC to the county for storage and distribution. (Doc. 33, Ex. 32, at 2.)

That same day, Plaintiff sent a lengthy letter to the MCTC in response to its request. (Doc. 33, Ex. 33 (8-8-07 Letter to the MCTC).) Plaintiff informed the MCTC that he did not feel Millard County should bear the expense of doing distribution. Plaintiff noted that the county was paying for the cost of distribution, but he could deliver a few copies, giving the county "control over your own separate stockpile of DMC copies." Plaintiff wrote that "Millard County may continue to purchase copies at cost and exercise partial control," or "purchase copies and exercise full control" if the county paid for the full cost of publishing instead of just printing and shipping. (*Id.*)

On August 10, 2007, the MCTC sent a letter to Plaintiff requesting that the county take possession of the magazines. (Doc. 33, Ex. 7; Doc. 1, at 92.) In the letter, County Commissioner Daron Smith asserted that "there is a misunderstanding or perhaps a dispute over ownership of [DMC]." Smith asserted that at the last MCTC meeting, the committee

decided to "tak[e] possession of 40,000 copies of the latest edition of [DMC] and have the county provide distribution from this point forward." Smith further indicated that the county "will expect to either pick up or have delivered the 40,000 copies of [DMC] that have been purchased by August 22, 2007. (*Id.*)

On August 20, 2007, Plaintiff responded to the letter, stating that the county could pick up the copies of DMC from a shed behind the Main Street Gallery in Delta, Utah, on August 22, 2007. (Doc. 33, Ex. 34 (8-20-07 Correspondence).) According to his complaint, Plaintiff had weighed his options and "finally decided that he had no choice" but to reluctantly send Millard County the letter indicting where it could pick up the copies of DMC. (Doc. 1, at 93.) That same day - August 20, 2007 - Plaintiff posted a notice on his business stating "We Are Closed For Business." (Doc. 33, Ex. 35 (Photocopy of Notice).)

On August 24, 2007, Plaintiff sent a letter to County Commissioner Daron Smith indicating among other things that Plaintiff "clearly owns [DMC] publication and distribution rights," that "all [the County] ha[s] paid for is the printing of DMC, as a sponsorship," that "[p]aying for the printing in no way gives them the right to control the distribution against the will of the publisher," and that Plaintiff "still maintain[s] full ownership and publishing rights to that publication." (*Id.* at 94.) Plaintiff's letter expressed concern that Millard County

intended to slow down distribution of DMC to make the current supply last longer.  (Doc. 1, at 90-92.)

Plaintiff asked a number of inquiries of the county concerning the distribution of DMC, but received no response to his questions or his August 24, 2007 letter.  (*Id.* at 95.) Plaintiff made various attempts over the next two years to resolve the dispute, including making demands to the county attorney, but was unsuccessful.  (*Id.* at 95-111.)

On May 13, 2009, the MCTC discussed the design and layout of a Millard County tourism magazine.  (Doc. 33, Ex. 36 (MCTC minutes), at 6-7.)  The project was awarded to the Chronicle Progress.

On July 30, 2009, Plaintiff visited von der Esch to "let her know that there is a lawsuit brooding and to determine what part she and the State of Utah played in the events that led up to the copyright infringement on DMC."  (Doc. 1, at 103.)  During that meeting, von der Esch told Plaintiff that she did not train the county commissioners to do what they did, and indicated that she knew very little about what took place.  (*Id.*)

Plaintiff's registered copyright for DMC was certified on September 7, 2009, and the effective date of registration was September 15, 2009.  (Doc. 1, attachment 2.)  The certificate says that the first date of publication was June 1, 2007.  (*Id.*)

On February 16, 2010, the new Millard County tourism magazine was delivered, with the cost of design, layout,

printing, and shipping on heavier glossy stock paper, totaling 82
cents per magazine.  (Doc. 33, Ex. 37 (Millard County Purchasing
Worksheet, Chronicle Progress invoice, and *Pick Your Adventure in
Millard County*).)

On August 18, 2010, Plaintiff filed his complaint in this
lawsuit.  (Doc. 1.)  The case was assigned to United States
District Judge Dale A. Kimball, who referred it to United States
Magistrate Judge Samuel Alba pursuant to 28 U.S.C. § 636(b)(1)(B)
on December 2, 2010.  (Docs. 25, 28.)

The Utah.com Defendants filed their motion to dismiss on
October 12, 2010 (Doc. 6); the Utah Tourism Defendants filed
their motion to dismiss on October 14, 2010 (Doc. 9), and the
Millard County Defendants filed their motion to dismiss/for
summary judgment on December 10, 2010 (Doc. 32).  On February 28,
2011, after the briefing was completed, the court held a hearing
to address the three motions.  (Doc. 43.)

## ANALYSIS

In his complaint, Plaintiff lists as parties the State of
Utah, the Utah Office of Tourism, two alleged employees of the
Utah Office of Tourism, and the Utah.com Defendants, listed as
"Utah.com LC, a quasi-Governmental Agency operating as an agency
of the State of Utah," and "Ryan Kirby, an employee of Utah.com."
(Doc. 1, at 1.)  Plaintiff's complaint requests damages and
injunctive relief under five causes of action.  First, Plaintiff
claims copyright infringement under 17 U.S.C. §§ 106, 204 (*id.* at

113-16), alleging that "[u]sing coercion, intimidation and
deception the defendants gained control of 60,000 copies of DMC,"
and then "devised their own distribution scheme and refused to
follow the directions of the Plaintiff"; that the infringement
upon Plaintiff's copyright was "willful and malicious"; and that
defendants obtained various commercial advantages and deprived
Plaintiff of his property. (*Id.* at 113-14.) Second, Plaintiff
claims civil conspiracy (*id.* at 116), alleging that "Defendants
entered into an agreement with each other to commit one or more
unlawful acts, including copyright infringement, fraud and
fraudulent concealment against the Plaintiff." (*Id.*) Third,
Plaintiff claims theft and theft by conversion (*id.* at 117-18),
alleging that "the Defendants did deprive the Plaintiff of his
property, . . . [DMC] fraudulently, willfully and maliciously,"
in violation of Utah Code Ann. § 76-6-404, and through means of
extortion, in violation of Utah Code Ann. § 76-6-406. Fourth,
Plaintiff claims loss of consortium (*id.* at 119), alleging that
Plaintiff "was caused to suffer the loss of his spouse's
companionship, services, and society from October 2007 through
October 2008" as a "direct result of the Defendants['] actions
and conspiratorial conduct." (*Id.*) Finally, Plaintiff claims
breach of contract (*id.* at 120-21), alleging that in 1983, a
"legally binding contract" between "Millard County and the
Plaintiff" was formed, and that beginning in February 2005,

"certain components of the contract began to be breached by Millard County." (*Id.*)

As set forth above, before the court are three dispositive motions: (1) a motion to dismiss filed by the Utah.com Defendants pursuant to Rule 12(b)(6); (2) a motion to dismiss filed by the Utah Tourism Defendants pursuant to Rules 12(b)(1) and 12(b)(6) (Docs. 9, 23); and (3) a motion to dismiss/for summary judgment filed by the Millard County Defendants (Doc. 32). The court examines each of these motions in turn.

### A. UTAH.COM DEFENDANTS' MOTION TO DISMISS

First, the court examines the Utah.com Defendants' Motion to Dismiss brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. In order to survive a Rule 12(b)(6) motion to dismiss, a complaint must set forth facts demonstrating a plausible claim for relief. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545, 547 (2007); *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009). A claim must be dismissed if the complaint does not contain enough facts to make the claim "plausible on its face." *Twombly*, 550 U.S. 544, 570 (2007). The reason for this plausibility standard is that Rule 8 does not "unlock the doors of discovery for a plaintiff armed with nothing more than conclusions," and therefore demands "more than an unadorned, the defendant-unlawfully-harmed-me accusation." *Iqbal*, 129 S.Ct. at 1949-1950.

Thus, in reviewing a motion to dismiss pursuant to Rule 12(b)(6), courts are guided by two principals set forth in *Twombly* and its progeny. First, a court is not required to accept as true legal conclusions and mere conclusory statements. *See id.* at 1949 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."); *see also Moya v. Schollenbarger*, 465 F.3d 444, 455-57 (10th Cir. 2006) (explaining that when considering a Rule 12(b)(6) motion, a court may consider only facts actually alleged and should disregard all conclusory allegations made without supporting factual averments); *Brooks v. Sauceda*, 85 F. Supp. 2d 1115, 1123 (D. Kan.), *aff'd*, 242 F.3d 387 (10th Cir. 2000) (explaining that "allegations of conclusions or of opinions" are not sufficient absent facts respecting statement of claim). Second, factual allegations must state a claim that is "plausible on its face." *Id.* at 1949. In other words, they must "be enough to raise a right to relief above the speculation level," *Twombly*, 550 U.S. at 545-547, and plead sufficient factual content to "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Iqbal*, 129 S.Ct. at 1950. The plausibility standard "is not akin to a 'probability requirement,'" but requires "more than a sheer possibility that a defendant has acted unlawfully." *Id.* In conducting this review, the court must "draw on its judicial experience and common sense." *Id.*

"Because [P]laintiff is proceeding *pro se*, the court must construe his pleadings liberally and hold them to a less stringent standard than formal pleadings drafted by lawyers," *Erickson v. Pardus*, 127 S. Ct. 2197, 2200 (2007); however, a "broad reading of "[Plaintiff's] complaint does not relieve [him] of the burden of alleging sufficient facts on which a recognized legal claim could be based." *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). The court "will not supply additional factual allegations to round out a plaintiff's complaint or construct a legal theory on a plaintiff's behalf." *Whitney v. New Mexico*, 113 F.3d 1170, 1173-74 (10th Cir. 1997). It is not the court's function to "assume the role of the advocate for the pro se litigant," and the dismissal of a pro se complaint under Rule 12(b)(6) is still proper "where it is obvious that the plaintiff cannot prevail on the facts he has alleged and it would be futile to give him an opportunity to amend," *Perkins v. Kan. Dept. of Corrections*, 165 F.3d 803, 806 (10th Cir. 1999).

In reviewing the Utah.com Defendants' Rule 12(b)(6) motion, the court examines the five claims for relief Plaintiff sets forth in his 122—page complaint: (1) copyright infringement, (2) civil conspiracy, (3) theft and theft by extortion, (4) loss of consortium, and (5) breach of contract. (Doc. 1, at 113-121.)

## 1. Private Entity

Before examining Plaintiff's five causes of action, the court first considers whether Utah.com is a private entity. In

his pleadings, Plaintiff makes various references to Utah.com being "quasigovernmental," and lists Utah.com in the caption of his pleadings as a "quasi-Governmental Agency operating as an agency of the State of Utah." (Doc. 1, at 1, 4.) The Utah.com Defendants dispute this characterization and argue that they are and always have been a private entity.

The Utah Tourism Defendants have submitted an affidavit from Richard W. Maw, President of Utah.com, declaring that "Utah.com is a privately owned and operated business that publishes a website known as Utah.com," that "Utah.com has always been a privately owned and operated business and has never operated as an agency of the State of Utah," and that "Ryan Kirby is an employee and partner of Utah.com." (Doc. 10-1.) In addition, Ryan Kirby submitted an affidavit declaring that "Utah.com is a privately owned and operated business that publishes a website known as Utah.com" and that he is "not currently nor have I eve[r] been an employee of the State of Utah." (Doc. 10-2.) Plaintiff has not provided the court with sufficient evidence for it to conclude that Utah.com is a quasi-governmental agency. The statement that someone made to him or in a meeting does not sufficiently rebute the sworn statements submitted by the defendants.

Having carefully reviewed the arguments and material provided, the court recognizes that Utah.com is a private entity and not an agency of the State (Doc. 7-1, Utah.gov "Complete

Agency List"; Doc. 7-2). *See* Utah Code Ann. §
63G-4-103(1)(b)-(c) (defining "Agency" as "a board, commission,
department, division, officer council, committee, bureau, or
other administrative unit of this state, including the agency
head, agency employees, or other persons acting on behalf of or
under the authority of the agency head" and defining "Agency
head" as "an individual or body of individuals in whom the
ultimate legal authority of the agency is vested by statute");
Utah Code Ann. § 16-17-102(5) (defining an "entity" capable of
appointing a registered agent as a person "that has a separate
legal existence or has the power to acquire an interest in real
property in its own name other than: . . . (e) a public
corporation, government or governmental subdivision, agency, or
instrumentality, or quasi-governmental instrumentality"); Utah
Code Ann. § 63G-6-103(29) ("State agency" or "the state" defined
as "any department, division, commission, council, board, bureau,
committee, institution, government corporation, or other
establishment, official, or employee of this state").

        Further, as the Utah.com Defendants argue, Plaintiff has no
more basis for claiming that the Utah.com Defendants are a
"quasi-governmental" agency of the state by creating websites for
various counties or being sponsored as an official tourism
website than he would for contending that he is a
quasi-governmental entity for creating various publications that
were sponsored by Millard County.

Thus, to the extent Plaintiff somehow intends to place liability upon the Utah.com Defendants by asserting that Utah.com is a quasi-governmental agency, that fact is untrue and provides him no relief.

## 2. Copyright Infringement

Plaintiff's first cause of action asserts a claim for copyright infringement. The Utah.com Defendants argue that Plaintiff's copyright infringement claim should be dismissed due to Plaintiff's failure to state a claim upon which relief can be granted. Specifically, the Utah.com Defendants argue that Plaintiff's complaint fails to "assert or even suggest that the Utah.com Defendants ever reproduced, copied, distributed, appropriated, took physical possession of, gained access to, had control of, discussed, reviewed, or had *any involvement whatsoever* with, the *DMC*, upon which to form the basis" of a copyright infringement claim. (Doc. 7, at 20.) Having carefully reviewed the record, the court agrees and recommends that to the extent that Plaintiff means to assert his copyright infringement claim against the Utah.com Defendants, Plaintiff's complaint fails to meet the standard to survive this Rule 12(b)(6) motion.

## a. Direct Infringement

First, to prevail on a claim for direct copyright infringement, Plaintiff must prove: (1) that he owns a valid copyright in DMC and (2) that the Utah.com Defendants reproduced or publicly distributed that publication without authorization.

*See R.W. Beck, Inc. v. E3 Consulting, LLC*, 577 F.3d 1133, 1142 (10th Cir. 2009). Plaintiff's complaint does not allege that the Utah.com Defendants reproduced or publicly distributed the DMC without authorization. Accordingly, Plaintiff's complaint fails to state a direct copyright infringement claim against those defendants.

### b. Contributory Infringement

Second, to the extent that Plaintiff means to assert a contributory infringement claim[4] against the Utah.com Defendants, that claim also does not survive the Utah.com Defendants' Rule 12(b)(6) motion.

To state a claim for contributory infringement, the complaint must allege "(i) direct copyright infringement by a third-party; (ii) knowledge by the defendant of the direct infringement; and (iii) material contribution to the infringement." *Shell v. American Family Rights Assoc.*, 2010 WL 1348548, * 16 (D. Colo., March 31, 2010) (unpublished) (internal citations omitted). Even were the court to assume that one or more of the other named defendants directly infringed upon

---

[4]Although the Copyright Act does not expressly provide for secondary liability, courts have held that liability for contributory infringement may be imposed upon one who knowingly aids, induces, or contributes to a copyright infringement by another. *See, e.g., Metro Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005); *Shell v. American Family Rights Assoc.*, 2010 WL 1348548, *16 (D. Colo., March 31, 2010) (unpublished) (and cases cited therein), *Home Design Servs., Inc. v. Stone Creek Homes, Inc.*, 2009 WL 4016054, * 3 (D.Colo., Nov. 13, 2009) (unpublished).

Plaintiff's alleged copyright, the complaint does not allege facts directly asserting or from which one could reasonably infer that the Utah.com Defendants contributed to that infringement. The complaint does not allege that those defendants knew that third parties were infringing upon Plaintiff's copyright. Nor does the complaint allege facts from which one could reasonably infer that those defendants made any material contribution to the alleged infringement. Accordingly, the court concludes that the complaint does not state a claim for contributory infringement as to the Utah.com Defendants. *See Capitol Records, Inc. v. Foster*, 2007 WL 1028532, at * 3 (W.D. Okla., Feb. 6, 2007) (unpublished) (dismissing contributory infringement claim because complaint failed to allege that defendant knew of or substantially participated in third parties' copyright infringement).

### c. Vicarious Infringement

Finally, a person may be held liable for vicarious infringement when it is established that he profited from direct infringement while declining to exercise a right to stop or limit it. *See Metro-Goldwyn-Mayer*, 545 U.S. at 930. To state a claim for vicarious infringement, the complaint "must allege that the defendant (i) had the right and ability to supervise the infringing activity or infringer; and (ii) possessed a direct financial interest in the exploited copyrighted materials." *Shell*, 2010 WL 1348548, at *16.

35

Plaintiff's complaint does not allege that the Utah.com Defendants had the right and ability to supervise the alleged infringing activity or the alleged infringer. Thus, it fails to meet the requirements of alleging a vicarious infringement against the Utah.com Defendants.

In conclusion, the court recommends that Plaintiff's copyright infringement claim be dismissed as to the Utah.com Defendants pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted.

### 3. Civil Conspiracy

Plaintiff's second cause of action asserts a claim for civil conspiracy. Specifically, Plaintiff claims that "[t]he defendants entered into an agreement with each other to commit one or more unlawful acts, including copyright infringement, fraud and fraudulent concealment against the Plaintiff." (Doc. 1, at 116.) Because Plaintiff's complaint does not actually assert a claim for fraud or fraudulent concealment, copyright infringement appears to be the only underlying tort upon which Plaintiff actually bases his conspiracy claim. *See Jackson v. Volvo Trucks North America, Inc.*, 462 F.3d 1234, 1238 (10th Cir. 2006) (citing *Alta Indus. Ltd. v. Hurst*, 846 P.2d 1282, 1290 n.17 (Utah 1993)) (explaining that "[u]nder Utah law, civil conspiracy requires, as one of its essential elements, an underlying tort" and finding that plaintiffs were barred from further litigation

of their conspiracy claim because the underlying tort claims were dismissed with prejudice).[5]

To prove a civil conspiracy, Plaintiff must establish the following five elements by clear and convincing evidence: "(1) a combination of two or more persons (2) an object to be accomplished, (3) a meeting of the minds on the object or course of action, (4) one or more unlawful, overt acts, and (5) damages as a proximate result thereof." *World Wide Assoc. of Specialty Programs v. Pure, Inc.*, 450 F.3d 1132, 1141 (10th Cir. 2006) (quoting *Alta Indus.*, 846 P.2d at 1290 n.17). In other words, to establish the existence of a conspiracy, a plaintiff seeking redress must show that there was a single plan to commit an unlawful act, the essential nature and general scope of which was known to and agreed upon by each person who is to be held responsible for its consequences. "While it is not necessary to provide direct evidence of a formal agreement in order to demonstrate a meeting of the minds, 'there must be substantial proof of circumstances from which it reasonably follows, or at least may be reasonably inferred, that the conspiracy existed.'" *Id.* (quoting *Israel Pagan Estate v. Cannon*, 746 P.2d 785, 790 (Utah App. 1987)). "'[C]onjecture and speculation alone' are not sufficient to establish that the conspiracy existed." *Id.*

---

[5]The court has recommended that Plaintiff's copyright infringement claim be dismissed. As a result, because the underlying tort claim has been dismissed, under *Jackson*, the court could dismiss Plaintiff's civil conspiracy claim.

Plaintiff's copyright infringement claim is based upon his allegations that after Millard County took possession of 60,000 copies of DMC, it unlawfully usurped or violated his right to determine how those copies of DMC were distributed. The Utah.com Defendants argue that Plaintiff's complaint contains no factual allegations to show that the Utah.com Defendants plausibly engaged in a civil conspiracy regarding copyright infringement. The court agrees. Not once in the complaint's entire 109-page "timeline" of factual allegations does Plaintiff allege any facts that would plausibly show that the Utah.com Defendants had a meeting of the minds with the Millard County Defendants to engage in behavior upon which to form the basis for Plaintiff's copyright infringement civil conspiracy claim against the Utah.com Defendants. Further, as discussed above, Plaintiff has not set forth any unlawful, overt acts upon which it would base this claim as to the Utah.com Defendants. Thus, the civil conspiracy claim should be dismissed as to the Utah.com Defendants.

### 4. Theft/Theft by Extortion

Plaintiff's third cause of action asserts a claim for theft and theft by extortion pursuant to Utah Code Sections 76-6-404 and 76-6-406. Section 76-6-404 provides that: "A person commits theft if he obtains or exercises unauthorized control over the property of another with a purpose to deprive him thereof." Section 76-6-106(1) provides that: "A person is guilty of theft

38

if he obtains or exercises unauthorized control over the property of another by extortion."

"'When a statute makes certain acts unlawful and provides criminal penalties for such acts, but does not specifically provide for a private right of action [the courts] generally will not create such a private right of action.'" *Cline II v. Utah Div. of Child and Family Servs.*, 142 P.3d 127, 136-37 (Utah App. 2005) (quoting *Youren v. Tintic Sch. Dist.*, 86 P.3d 929 (Utah 2004)) (additional internal citation omitted). Although the Utah Code provides criminal penalties for theft, it does not provide for a private right of action for that conduct. Thus, because a private right of action does not exist in Utah for theft and theft by extortion, the court recommends that Plaintiff's third cause of action be dismissed.

### 5. Loss of Consortium

Plaintiff's fourth cause of action asserts a claim for loss of consortium, alleging that he was "caused to suffer the loss of his spouse's companionship, services, and society from October 2007 through October 2008," his wife "having been forced to move to Salt Lake City to take employment, and the Plaintiff needing to remain in Delta until their home sold," which Plaintiff alleges "was caused as a direct result of the Defendants['] actions and conspiratorial conduct." (Doc. 1, at 119.)

The Utah Code provides a private cause of action for loss of consortium only due to personal injury. *See* Utah Code Ann. § 30-

2-11.  The statute provides that "[t]he spouse of a person

injured by a third party on or after May 4, 1997, may maintain an

action against the third party to recover for loss of

consortium."  Utah Code Ann. § 30-2-11(2).  Here, Plaintiff

claims that he, not his spouse, was injured by third parties and,

as a result, he lost the consortium of his wife for approximately

one year.[6]

Further, the statute also limits the compensable injury to:

(1) "a partial or complete paralysis of one or more of the

extremities"; (2) "significant disfigurement"; or (3)

"incapability of the person of performing the types of jobs the

person performed before the injury."  Utah Code Ann. § 30-2-

11(1)(a).  Plaintiff does not allege any such injury in his

complaint.

Therefore, Plaintiff's complaint does not set forth facts

that meet the elements of Utah's statute allowing for a private

loss of consortium claim.  Plaintiff, rather than his wife, is

_____

[6]The court notes that Plaintiff may not seek compensation on
behalf of his wife.  Plaintiff is not acting as his wife's
attorney, and his wife is not a party to this lawsuit.  *See
Parsons v. Burns*, 846 F. Supp. 1372, 1382 (W.D.Ark. 1993)
(granting defendants' motion to dismiss because plaintiff was not
entitled to appear and seek damages on behalf of his wife who was
not a party to the lawsuit); *see also National Counsel for
Improved Health v. Shalala*, 122 F.3d 878, 882 (10th Cir. 1997)
(holding that a plaintiff may not assert the rights of another
who is not before the court); *Warth v. Seldin*, 422 U.S. 490, 499
(1975) (explaining that parties "generally must assert [their]
own legal rights and interests, and cannot rest [their] claim to
relief on the legal rights or interests of third parties").

bringing this claim, and Plaintiff does not allege he suffered from one of the three compensable injuries.  As a result, the court recommends that Plaintiff's fourth cause of action be dismissed.

### 6.  Breach of Contract

Plaintiff's fifth and final cause of action is for breach of contract, wherein Plaintiff specifically alleges that a "legally binding contract was formed between Millard County and the Plaintiff in 1983," and sets forth the terms of his alleged contract with the Millard County Defendants.  (Doc. 1, at 120-21.)  Aside from the conclusory allegation that "the Defendants" breached the contract with Plaintiff, there are no references to the Utah.com Defendants, and nowhere in the complaint does Plaintiff allege that he entered into a contract with the Utah.com Defendants.  *See Blair v. Axiom Design, LLC*, 2001 UT 20, ¶ 14, 20 P.3d 388 (prima facie breach of contract case requires proof of (1) a contract, (2) performance by the party seeking recovery, (3) breach by the other party, and (4) damages).  Plaintiff's complaint contains no facts establishing that Plaintiff had a contract with the Utah.com Defendants, and thus the complaint fails to establish that the Utah.com Defendants breached a contract with Plaintiff.  Thus, Plaintiff's breach of contract claim should be dismissed as to the Utah.com Defendants.

In conclusion, the Utah.com Defendants' motion to dismiss should be granted.

## B. UTAH TOURISM DEFENDANTS' MOTION TO DISMISS

The court next examines the Utah Tourism Defendants' motion to dismiss. The Utah Tourism Defendants argue this claim should be dismissed as to them pursuant to both Rule 12(b)(1) and Rule 12(b)(6) of the Federal Rules of Civil Procedure. The court first addresses the Utah Tourism Defendants' Rule 12(b)(1) jurisdictional arguments, and then addresses the Utah Tourism Defendants' Rule 12(b)(6) arguments.

### 1. Rule 12(b)(1)

Federal courts are courts of limited jurisdiction. Rule 12(b)(1) of the Federal Rules of Civil Procedure provides that a court may exercise jurisdiction over a case or cause of action only when specifically authorized to do so and demands that a court "dismiss [a] case at any stage of the proceeding in which it becomes apparent that [subject matter] jurisdiction is lacking." *Basso v. Utah Power & Light Co.*, 495 F.2d 906, 909 (10th Cir. 1974) (citations omitted). A "party who seeks to invoke federal jurisdiction bears the burden of establishing that subject matter jurisdiction is proper." *Id.* Finally, when a motion under Rule 12(b)(1) constitutes a "facial attack on the allegations of subject matter jurisdiction," the court will presume the allegations are true. *Ruiz v. McDonnell*, 299 F.3d 1173, 1180 (10th Cir. 2002).

In bringing a motion to dismiss based upon Rule 12(b)(1), "[a] party may go beyond allegations contained in the complaint

and challenge the facts upon which subject matter jurisdiction depends." *Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir. 1995) (citation omitted). When a party makes "a factual attack on subject matter jurisdiction," it is improper to "presume the truthfulness of the complaint's factual allegations." *Id.* (citation omitted).

### a. Eleventh Amendment Immunity

"A motion to dismiss based on immunity is treated as a 12(b)(1) motion to dismiss for lack of subject matter jurisdiction." *Meyers v. Colorado Dept. of Human Servs.*, 62 Fed. Appx. 831, 832 (10th Cir. 2003) (citation omitted). The Utah Tourism Defendants argue that the Eleventh Amendment bars all of Plaintiff's claims as to the State of Utah, the Utah Office of Tourism, and Leigh van der Esch in her official capacity.

#### i. *Copyright Infringement Claim*

First, the Utah Tourism Defendants argue that Plaintiff's claim for copyright infringement pursuant to the Copyright Act of 1976, 17 U.S.C. § 101 et seq., against the State of Utah, the Utah Office of Tourism, and von der Esch in her official capacity, is barred by the Eleventh Amendment. Having examined this argument, the court agrees and recommends that Plaintiff's copyright infringement claim against these Utah Tourism Defendants be dismissed for lack of jurisdiction.

The Eleventh Amendment precludes suits against non-consenting states, whether brought by their own citizens or

by citizens of other states. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984); *Edelman v. Jordan*, 415 U.S. 651, 662-63 (1974); *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 54 (1996) (citing *Hans v. Louisiana*, 134 U.S. 1, 13 (1890)); *Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 72-73 (2000); *Board of Trustees of the Univ. of Alabama v. Garrett*, 531 U.S. 356, 363 (2001). The Supreme Court has reiterated, "[t]he ultimate guarantee of the Eleventh Amendment is that nonconsenting States may not be sued by private individuals in federal court." *Garrett*, 531 U.S. at 363; *accord Seminole Tribe*, 517 U.S. at 72-73; *Kimel*, 528 U.S. at 79-80. "Eleventh Amendment immunity, like qualified immunity, provides not only a defense to liability, but operates as an immunity to suit, including the burdens of discovery and trial." *Olson v. Finney*, 885 F. Supp. 1480, 1485 (D. Kan. 1995) (citation omitted).

Congress may abrogate a State's Eleventh Amendment sovereign immunity only "when it both unequivocally intends to do so and [when it] acts pursuant to a valid grant of constitutional authority." *Garrett*, 531 U.S. at 363; *accord Seminole Tribe*, 517 U.S. at 72-73; *Kimel*, 528 U.S. at 79-80. As to the first prong of this test, the Copyright Act's plain language makes it clear that Congress intended to abrogate the States' sovereign immunity from suit in copyright matters through the Act. *See* 17 U.S.C. § 511(a).

As to the second prong, however, all of the courts that have considered the question to date have found that Congress lacked a valid grant of constitutional authority to abrogate the State's sovereign rights under the Copyright Act. *See Chavez v. Arte Publico Press*, 204 F.3d 601 (5th Cir. 2000) (Congress' purported abrogation of the States' immunity under the Copyright Act was not justified under the Fourteenth Amendment's enforcement provision); *Rodriguez v. Texas Comm'n on the Arts*, 199 F.3d 279 (5th Cir. 2000) (holding that the Patent Remedy Act did not effectively abrogate the States' sovereign immunity because its attempt to do so was not a valid act of Congressional power under Section 5 of the Fourteenth Amendment); *Jacobs v. Memphis Convention and Visitors Bureau*, 710 F.Supp. 2d 663 (W.D. Tenn. 2010) (Congress' purported abrogation of the States' immunity under the Copyright Act was not justified under the Fourteenth Amendment's enforcement provision); *Romero v. California Dept. of Transportation*, 2009 WL 650629 (C.D. Cal., March 12, 2009) (unpublished) (same); *Marketing Information Masters, Inc. v. Bd. of Trustees of Cal. State Univ.*, 552 F.Supp.2d 1088 (S.D. Cal. 2008) (same); *Nat'l Assoc. of Bds. of Pharmacy v. Board of Regents of the Univ. System of Georgia*, 2008 WL 1805439 (M.D. Ga., April 18, 2008) (unpublished) (same); *Infomath, Inc., v. Univ. of Arkansas*, 633 F.Supp.2d 674 (E.D. Ark. 2007) (same); *Hairston, Jr. v. North Carolina Agricultural & Technical State*

*Univ.*, 2005 W.L. 2136923 (M.D. N. Car., Aug. 5, 2005) (unpublished).  This includes *Wilcox v. Career Step, L.L.C.*, Case No. 2:08-cv-998-CW, 2010 WL 4968263, *5 (D. Utah, Dec. 1, 2010) (Slip Copy), in which United States District Judge Clark Waddoups concluded that the attempt by the Copyright Remedy Clarification Act of 1990 to abrogate states' Eleventh Amendment immunity is unconstitutional.

The holdings in those decisions were made after analyzing whether, in light of the Supreme Court's decisions in *Florida Prepaid Postsecondary Educational Expense Board v. College Savings Bank*, 527 U.S. 627 (1999), *College Savings Bank v. Florida Prepaid Postsecondary Educational Board*, 527 U.S. 666 (1999), and *Kimel v. Florida Board of Regents*, 528 U.S. 62 (2000), Congress had the authority to abrogate state sovereign immunity through the Copyright Act.  *See, e.g.*, *Chavez*, 204 F.3d at 603-608; *Rodriquez*, 199 F.3d at 281.  All of the courts concluded that Congress did not have that authority and, accordingly, each of the state entities and state employees involved were immune from the copyright infringement claims asserted against them.

This court is persuaded to follow *Chavez* and its progeny. Plaintiff has argued that *Chavez* does not apply to this particular case in both his pleading (Doc. 44) and at oral argument; however, Plaintiff misunderstands the analysis the

court must follow.  The court does not examine whether or not
Congress acted properly based upon individual cases; instead, the
court examines the Congressional Record to determine whether
Congress acted properly when it tried to abrogate the states'
sovereign immunity *when the Act was passed*.  Therefore, this
court adopts *Chavez*'s conclusion that Congress' attempt to
abrogate the states' sovereign immunity through the Copyright Act
was not an appropriate exercise of its enforcement authority
under Section 5 of the Fourteenth Amendment; therefore, claims
made under the Copyright Act against states, their actors, and
entities are barred by Eleventh Amendment immunity.  As a result,
this court concludes that it lacks jurisdiction to consider
Plaintiff's copyright infringement claims to the extent they are
asserted against the State of Utah, the Utah Office of Tourism,
and Leigh von der Esch in her official capacity, and the court
recommends that Plaintiff's copyright infringement claims against
those defendants be dismissed.

### ii.  *State Claims*

Absent a state's express waiver of sovereign immunity, under
the Eleventh Amendment a federal court lacks subject matter
jurisdiction to determine if the state and its officers have
violated the state's own law.  *Harrell v. United States*, 443 F.3d
1231, 1234 (10th Cir. 2006)*; Olson*, 885 F. Supp. at 1485.  The
Utah Tourism Defendants argue that all of the state causes of
action - meaning Plaintiff's second, third, fourth, and fifth

causes of action - are barred by the Eleventh Amendment as to the State of Utah, the Utah Office of Tourism, and Ms. van der Esch in her official capacity, because the Eleventh Amendment protects the state and its officials in their official capacity from suit in federal court. *See Pennhurst St. Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106-07 (1984). Having examined this argument, the court agrees with the Utah Tourism Defendants.

In this case, Plaintiff has sued the State of Utah, the Utah Office of Tourism, and Defendant von der Esch in her official capacity for monetary damages for alleged violations of Utah law; however, the State of Utah has not waived its Eleventh Amendment immunity, nor has Congress abrogated the State of Utah's Eleventh Amendment for the alleged violations of state law. Therefore, this court lacks jurisdiction to determine whether Defendants State of Utah, Utah Office of Tourism, and van der Esch in her official capacity, have violated any of the four state laws upon which Plaintiff relies in bringing his state law claims against those defendants. As a result, the court recommends that Plaintiff's second, third, fourth, and fifth causes of action be dismissed as against the State of Utah, the Utah Office of Tourism, and van der Esch in her official capacity.

In conclusion, all of Plaintiff's claims are barred by the Eleventh Amendment as to the State of Utah, the Utah Office of Tourism, and Ms. van der Esch in her official capacity.

### b. Utah Governmental Immunity Act

The Utah Tourism Defendants argue that this court also lacks jurisdiction over some of Plaintiff's claims because Plaintiff failed to comply with the requirements of the Utah Governmental Immunity Act ("Governmental Immunity Act"). *See* Utah Code Ann. § 63G-7-101 et seq.

### i. *Second, Third, and Fourth Causes of Action*

First, the Utah Tourism Defendants argue that Plaintiff's second, third, and fourth causes of action are barred because Plaintiff failed to file a timely notice of claim under the Governmental Immunity Act.

The notice provisions of the Governmental Immunity Act apply to all state law claims against Utah's governmental entities and their employees, with the exception of certain actions arising out of contractual rights and obligations or latent defects, and are jurisdictional in nature. The Governmental Immunity Act mandates that "[a]ny person having a claim against a governmental entity . . . shall file a written notice of claim with the entity before maintaining an action." Utah Code Ann. § 63G-7-401(2). The notice requirements of the Governmental Immunity Act must be strictly followed and the timely and proper filing of a notice is a jurisdictional prerequisite to suit. *See Suazo v. Salt Lake City Corp.*, 168 P.3d 340, 342 (Utah Ct. App. 2007), *Wheeler v. McPherson*, 40 P.3d 632, 635 (Utah 2002) (stating that "compliance with the Immunity Act is a prerequisite to vesting a district

court with subject matter jurisdiction over claims against governmental entities"); *Greene v. UTA*, 37 P.3d 1156, 1159 (Utah 2001). "Actual notice does not cure a party's failure to meet [the Governmental Immunity Act's] requirements." *Rushton v. Salt Lake County*, 977 P.2d 1201, 1203 (Utah 1999).

Under the Governmental Immunity Act, a "claim" means "any asserted demand for or cause of action for money or damages, whether arising under the common law, under state constitutional provisions, or under state statutes, against a governmental entity or against an employee in the employee's personal capacity." Utah Code Ann. § 63G-7-102(1). Pursuant to the Governmental Immunity Act, the notice of claim must be filed within one year of the date the claim arises and must be "directed and delivered" to "the attorney general, when the claim is against the state." Utah Code Ann. § 63G-7-401(3)(b)(ii)(E). Alternatively, notice may be directed and delivered to "the agent designated by a governmental entity" in a statement that the entity is required to file with the Division of Corporations and Commercial Code. *Id.* at § 63G-7-401(3)(b)(ii)(G) & (5).

Plaintiff has not alleged facts or presented evidence supporting that Plaintiff filed a timely notice of claim asserting the state claims set forth in his complaint against the Utah Tourism Defendants. This defect cannot be cured because the one year deadline for filing a notice of claim has passed for all three state law claims.

Plaintiff's second cause of action - for civil conspiracy - (Doc. 1, at 113-14) alleges that the conspiracy resulted in Plaintiff being deprived of possession and distribution rights to DMC. (Doc. 1, at 116.) Thus, based on the facts alleged and the evidence presented, the court concludes that the conspiracy came to light no later than August 22, 2007, when Millard County took possession of 60,000 copies of the DMC. Accordingly, the deadline for filing a notice of claim for the civil conspiracy claim was August 22, 2008.

Plaintiff's third cause of action - for theft or theft by extortion, pursuant to Section 76-6-404 of the Utah Criminal Code (Doc. 1, at 117-18) - alleges that the theft occurred on August 22, 2007, when Millard County took possession of 60,000 copies of the DMC. (*Id.*) Accordingly, the deadline for filing a notice of claim for the theft or theft by extortion claim alleged in Plaintiff's third cause of action was August 22, 2008.

Plaintiff's fourth cause of action asserts a claim for loss of consortium from October 2007 through October 2008. (Doc. 1, at 119.) Thus, the deadline for filing a notice of claim for Plaintiff's fourth cause of action was October 2009.

As a result, the court concludes that Plaintiff's second, third, and fourth causes of action are barred as against the State of Utah, Utah Office of Tourism, and Ms. van der Esch in her official capacity. Therefore, the court recommends that

Plaintiff's second, third, and fourth causes of action as against those defendants be dismissed with prejudice.

### ii.  UCA § 63G-7-202(3)(a)

To recover against a government employee such as Defendant von der Esch personally, a plaintiff's sole remedy is through the Governmental Immunity Act.  Under the Governmental Immunity Act, to state a claim for relief and invoke a court's jurisdiction, a plaintiff must allege facts, in both a timely filed notice of claim and in his complaint, sufficient to alert the governmental entity "that the claimant seeks to bring a cause of action against a government employee personally due to the employee's fraudulent or malicious conduct." *Mecham v. Frazier*, 193 P.3d 630, 635 (Utah 2008); *see also, Straley v. Halliday*, 997 P.2d 338, 341 (Utah App. 2000).

Plaintiff did not file such a timely notice of claim. Therefore, this court lacks subject matter jurisdiction over the claims brought against van der Esch personally, and all of Plaintiff's state causes of action should be dismissed as against von der Esch personally.

### 2.  Rule 12(b)(6)

The court next turns to the Utah Tourism Defendants' argument that Plaintiff's first, second, third, and fourth causes of action fail to state a claim upon which this court may grant relief. *See* Fed. R. Civ. P. 12(b)(6).

52

### a.  Copyright Infringement

First, the Utah Tourism Defendants argue that Plaintiff
failed to state a plausible copyright infringement claim against
them.  Having examined this argument, the court agrees that
Plaintiff's complaint does not meet the *Iqbal* and *Twombly*
standard in stating a copyright infringement claim against the
Utah Tourism Defendants.

The court analyzes the sufficiency of Plaintiff's complaint
by following the analysis applied above to the copyright
infringement claim and the Utah.com Defendants.  First,
Plaintiff's complaint fails to allege that any of the Utah
Tourism Defendants reproduced or publicly distributed DMC without
authorization.  As a result, the complaint fails to state a
direct copyright infringement claim against those defendants.

Second, Plaintiff's complaint does not allege facts directly
asserting or from which one could reasonably infer that the Utah
Tourism Defendants contributed to a copyright infringement.  The
complaint does not allege that any of those defendants knew that
third parties were infringing upon Plaintiff's alleged copyright.
It also does not allege facts from which one could reasonably
infer that those defendants made any material contribution to the
alleged infringement.  Thus, the complaint does not state a claim
for contributory infringement as to the Utah Tourism Defendants.
*See Capitol Records, Inc. v. Foster*, 2007 WL 1028532, *3 (W.D.
Oklahoma, Feb. 6, 2007) (unpublished) (dismissing contributory

infringement claim because complaint failed to allege that defendant knew of, substantially participated in, or profited from third parties' copyright infringement).

Third, Plaintiff's complaint does not allege that the Utah Tourism Defendants financially profited from any direct infringement committed by another person. In addition, although the complaint contains conclusory allegations, speculation, and legal conclusions implying that the Utah Office of Tourism had some sort of supervisory authority over the Utah.com Defendants, that implication is not supported by the law or any of the facts. As discussed above, the Utah.com Defendants are not state entities or employees. The bare allegation that the Utah Tourism Defendants were part of a conspiracy is not enough to subject them to vicarious liability for other's acts. *See Shell*, 2010 WL 1348548, *16. Therefore, the court concludes that Plaintiff's complaint fails to state a claim for vicarious infringement as to the Utah Tourism Defendants.

In conclusion, Plaintiff's complaint does not state a claim upon which this court can grant relief for copyright infringement as to the Utah Tourism Defendants. Consequently, this court recommends that Plaintiff's first cause of action be dismissed as to those defendants, including Defendant van der Esch personally.

### b. Civil Conspiracy

Second, the Utah Tourism Defendants argue that Plaintiff failed to state a plausible civil conspiracy claim against them.

54

As with Plaintiff's first claim, having examined this argument, the court agrees that the complaint's factual allegations do not meet the *Iqbal* and *Twombly* standard in stating a civil conspiracy claim against the Utah Tourism Defendants.

As with the copyright infringement claim, the court follows its analysis regarding the sufficiency of the civil conspiracy claim as to the Utah.com Defendants in analyzing the Utah Tourism Defendants' argument.

Plaintiff's second cause of action asserts that "[t]he Defendants entered into an agreement with each other to commit one or more unlawful acts, including copyright infringement, fraud and fraudulent concealment against the Plaintiff." (Doc. 1, at 116.) Because, the complaint does not assert a claim for fraud or fraudulent concealment, copyright infringement is the only underlying tort upon which Plaintiff may base his conspiracy claim. Because the court has concluded that Plaintiff's complaint fails to assert a copyright infringement claim as to the Utah Tourism Defendants, Plaintiff's civil conspiracy claim fails. *See Jackson*, 462 F.3d at 1238 (citing *Alta Indus.*, 846 P.2d at 1290 n. 17) (explaining that "[u]nder Utah law, civil conspiracy requires, as one of its essential elements, an underlying tort" and finding that plaintiffs were barred from further litigation of their conspiracy claim because the underlying tort claims were
dismissed with prejudice).

Furthermore, Plaintiff's complaint fails to set forth facts to support the other elements of a civil conspiracy claim as to the Utah Tourism Defendants.

Plaintiff's complaint asserts a bare bones speculative accusation of participation in a conspiracy by the Utah Office of Tourism and von der Esch without any supporting facts. Such bare assertions are not entitled to the assumption of truth. *See Twombly*, 550 U.S. at 555 (noting that plaintiffs' assertion of an unlawful agreement/conspiracy was a "'legal conclusion'" and, as such, was not entitled to the assumption of truth); *Iqbal*, 129 S. Ct. at 1950-51 (noting that the bare assertions contained in the complaint, "much like the pleading of conspiracy in *Twombly*," were conclusory and not entitled to the assumption of truth). The factual allegations in Plaintiff's complaint that the court must presume to be true do not plausibly suggest that Plaintiff is entitled to relief from the Utah Office of Tourism or von der Esch with respect to his conspiracy claim.

Read very liberally, the complaint alleges that the following facts show that the Utah Tourism Defendants engaged in the alleged civil conspiracy. First, on February 21, 2007, Linda Gillmore, Millard County Tourism Director, "reported that she had met with Leigh von der Esch a few times and provided her with information about where Millard County was going with its tourism program," (Doc. 1, at 68). Second, Plaintiff met with von der Esch on April 17, 2007, and told her that (a) Millard County and

56

Linda Gillmore were "trying to take over tourism in Millard County;" (b) "the history and how the agreements came about;" (c) "the damage that is being done to his business;" (d) he was "upset by Linda Gillmore's statement that it was not her job to keep him in business;" and (e) Millard County Commissioner "Kathy Walker and Linda Gillmore were working as a team with the apparent goal of taking over Discovering Millard County and all of the other tourism projects Plaintiff had been working on," (Doc. 1, at 82). Third, during a May 9, 2007, MCTC meeting, Gillmore reported that von der Esch had called and talked to her and that von der Esch was going "to work with the County" (Doc. 1, at 84). Taken as true, those facts do not suggest that the Utah Office of Tourism or von der Esch combined with any of the other named defendants for the agreed upon purpose of infringing upon Plaintiff's distribution rights with respect to DMC. *See Twombly*, 550 U.S. at 556 (stating a claim for conspiracy requires that a complaint allege enough "factual matter (taken as true) to suggest that an agreement was made."). The complaint does not allege any formal agreement to conspire or circumstances "from which it reasonably follows, or at least may be reasonably inferred" that a conspiracy existed. *World Wide Ass'n*, 450 F.3d at 1141 (citation omitted). The factual allegations set forth in Plaintiff's complaint and the bare assertions of conspiracy are simply insufficient to suggest that any agreement existed between

the Utah Tourism Defendants and any other defendant to infringe upon Plaintiff's copyright.

Thus, Plaintiff's civil conspiracy claim against the Utah Tourism Defendants should be dismissed.

### c.  Theft/Theft by Extortion

For the same reasons it should be dismissed as to the Utah.com Defendants, Plaintiff's third cause of action for theft/theft by extortion should be dismissed as to the Utah Tourism Defendants.  A private right of action does not exist in Utah for such a claim.

### d.  Loss of Consortium

Plaintiff's fourth cause of action for loss of consortium also should be dismissed for the same reasons it should be dismissed as to the Utah.com Defendants.  Plaintiff has not set forth facts supporting the requirements of such a cause of action in Utah, and only Plaintiff's wife could bring that cause of action regarding any injury to Plaintiff.  *See* Utah Code Ann. § 30-2-11.

In conclusion, the court recommends that the Utah Tourism Defendants' motion to dismiss be granted.

### C.  MILLARD COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Finally, the court turns to the Millard County Defendants' summary judgment motion.  Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law."
Fed. R. Civ. P. 56(a). Material facts are those that "might
affect the outcome of the suit under the governing law."
*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).
Genuine disputes are those that are supported by admissible
evidence sufficient for a reasonable trier of fact to find in
favor of the nonmoving party. *Id.* at 247-48. In considering
whether there is a triable factual dispute, the court views all
evidence and draws all reasonable inferences therefrom in the
light most favorable to the nonmoving party. *See id.* at 255;
*Burke v. Utah Transit Auth. & Local 382,* 462 F.3d 1253, 1258 (10th
Cir. 2006), *cert. denied*, 550 U.S. 933 (2007).

    "Although the movant must show the absence of a genuine
issue of material fact, he or she need not negate the nonmovant's
claim." *Simms v. Oklahoma ex rel. Dep't of Mental Health &
Substance Abuse Servs.*, 165 F.3d 1321, 1326 (10th Cir. 1999).
"Once the movant carries this burden, the nonmovant cannot rest
upon his or her pleadings, but 'must bring forward specific facts
showing a genuine issue for trial as to those dispositive matters
for which [he or she] carries the burden of proof.'" *Id.* (quoting
*Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996)). "'The mere
existence of a scintilla of evidence in support of the
nonmovant's position is insufficient to create a dispute of fact
that is "genuine"; an issue of material fact is genuine only if
the nonmovant presents facts such that a reasonable jury could

find in favor of the nonmovant.'" *Id.* (quoting *Lawmaster v. Ward*, 125 F.3d 1341, 1347 (10th Cir. 1997)).

Plaintiff is proceeding pro se. As a result, the court construes his complaint liberally, *see Kay v. Bemis*, 500 F.3d 1214, 1218 (10th Cir. 2007); however, "[t]his liberal treatment is not without limits," *id.* Plaintiff must still abide by the Federal Rules of Civil Procedure, including properly contesting the Millard County Defendants' summary judgment motion. *See id.* (providing that "pro se parties [must] follow the same rules of procedure that govern other litigants").

## 1. Qualified Immunity

The court first addresses the Millard County Defendants' assertion that this court lacks jurisdiction over Plaintiff's claims as to the defendant Millard County employees because those claims are barred by qualified immunity. "'[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Watson v. University of Utah Medical Cntr.*, 75 F.3d 569, 577 (10th Cir. 1996) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Qualified immunity protects defendants not only from liability but also from suit," *Watson*, 75 F.3d at 577; therefore, "the Supreme Court has repeatedly 'stressed the importance of resolving immunity questions at the earliest

possible stage in litigation,'" *Albright v. Rodriguez*, 51 F.3d 1531, 1534 (10th Cir. 1995) (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991)).

When a defendant raises a qualified immunity defense in a motion for summary judgment, the burden shifts to the plaintiff to meet a strict two-part test.  The plaintiff's burden is heavy. *See Jantz v. Muci*, 976 F.2d 623, 627 (10th Cir. 1992) (citation omitted), *cert. denied*, 508 U.S. 952 (1993).  "First, the plaintiff must demonstrate that the defendant's actions violated a constitutional or statutory right.  Second, the plaintiff must show that the constitutional or statutory rights the defendant allegedly violated were clearly established at the time of the conduct at issue."  *Id.* at 1534-35 (citations omitted).  If the plaintiff meets this two-part test, then the burden shifts back to the defendant, who then bears the summary judgment motion movant's traditional burden:  showing "that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law."  *Id.* at 1535 (quotation marks and citation omitted).  The dispositive question is "whether an objectively reasonable official would understand that the alleged improper actions were unlawful."  *Anderson v. Creighton*, 483 U.S. at 642.

Having carefully examined the pleadings, the court concludes that Plaintiff has not met his burden in order to overcome the Millard County employees' claim of qualified immunity.  As the

court discusses below, Plaintiff has not presented evidence sufficient to meet the elements of the claims he has asserted in his complaint.

Thus, because Plaintiff has not shown that defendants' actions violated a statutory or constitutional right that was clearly established at the time of the violation, it follows that an objectively reasonable official would not understand that the alleged improper actions were unlawful. Plaintiff does not overcome the defendants' assertion of qualified immunity. As a result, the Millard County defendant employees are shielded from liability for monetary damages, and should be dismissed from this action.

### 2. Defendants Gillmore, Jackson, and Cooper

The Millard County Defendants also argue that all claims as to Defendants Gillmore, Jackson, and Cooper - the former Millard County employees named as defendants in this action - should be dismissed because Plaintiff's complaint does not specifically allege that they were involved with any of the facts upon which Plaintiff's claims are based.

Regarding Defendant Cooper, Plaintiff alleges that he violated his constitutional rights because he failed to "vouch for the Plaintiff," or "step forward as a man" and help Plaintiff . . . "he was silent." (Doc. 35, at 38.) Regarding Defendant Jackson, who was county attorney in 2005, Plaintiff alleges that he "failed to step forward and prevent it." (*Id.*) Regarding

Defendant Gillmore, Plaintiff alleges that she "played a pivotal role in the takeover as well, boldly stating that it was not her job to keep the Plaintiff in business." (*Id.*) These are the only specific "acts" Plaintiff has set forth regarding these three defendants, and they are not enough to show that any of these three defendants violated Plaintiff's statutory or constitutional rights.

"[G]overnment officials are not vicariously liable for the misconduct of their subordinates" for claims arising under § 1983. *Serna v. Colorado Dept. of Corrections*, 455 F.3d 1146, 1151 (10th Cir. 2006). Supervisors can only be held liable upon a showing that they were "personally 'involved in the constitutional violation,' and [that] a 'sufficient causal connection' . . . exist[s] between the supervisor and the constitutional violation." *Id.* (citation omitted). To establish an "affirmative link," Plaintiff "must show that a supervisory defendant, expressly or otherwise, authorized, supervised, or participated in conduct which caused the constitutional deprivation." *Snell v. Tunnell*, 920 F.2d 673, 700 (10th Cir. 1990), *cert. denied*, 499 U.S. 976 (1991). An "affirmative link" may be established based on the person's "personal participation, his exercise of control or direction, or his failure to supervise.'" *Worrell v. Henry*, 219 F.3d 1197, 1214 (10th Cir. 2000) (quoting *Meade v. Grubbs*, 841 F.2d 1512, 1527 (10th Cir. 1988)), *cert. denied*, 533 U.S. 916 (2001).

Even assuming the truth of the allegations set forth in Plaintiff's complaint, and drawing all permissible inferences in the light most favorable to Plaintiff, Plaintiff has failed to sufficiently allege specific facts in order to establish an "affirmative link" between Defendants Gillmore, Jackson, and Cooper's conduct and the alleged constitutional violations.

Plaintiff's complaint fails to identify any conduct that violated Plaintiff's statutory or constitutional rights that might reasonably be attributed to Defendants Gillmore, Jackson, and Cooper. As a result, the court concludes that all claims in this action as to these three defendants should be dismissed.[7]

### 3. Copyright Infringement (Sole Federal Claim)

Next, the court addresses the Millard County Defendants' challenge to Plaintiff's copyright infringement claim, his only federal claim in this action.

The Copyright Act is comprised of two categories of property interests: (1) the "bundle" of copyrights owned by the copyright holder and (2) the personal property rights of the owner of the

---

[7] The Millard County Defendants assert that Plaintiff's argument that these three defendants failed to protect him gives rise to the public duty rather than a § 1983 claim. Assuming that is the case, under the public duty doctrine, Plaintiff must establish that Defendants Cooper, Jackson, and Gillmore owed him a duty as an individual, not simply a duty to the general public. *See Gadd v. U.S.*, 971 F. Supp. 502, 511 (D. Utah 1997). Such a claim fails because Plaintiff does not cite to any conduct or relationship between himself and Millard County that would support a heightened duty of care to what is owed to the public in general. *See Day v. DPS*, 980 P.2d 1171, 1174 (Utah 1999), *Nelson v. SLC*, 919 P.2d 568 (Utah 1996).

good(s).  *See* 17 U.S.C. § 202 ("Ownership of a copyright, or of any of the exclusive rights under a copyright, is distinct from ownership of any material object in which the work is embodied.");  *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 546-47 (1985).  The sale of the copyrighted good, however, results in a "splitting" or separation of these property interests:  the copyright owner retains the copyright interest and the purchaser receives the personal property interest in the good.  This is because the sale of a copyrighted good transfers the personal property interest in the good to the purchaser, but does not transfer the copyright interest.  *See* 17 U.S.C. § 202.

Plaintiff's copyright infringement claim, as it relates to the Millard County Defendants, appears to be that they interfered with Plaintiff's control over the distribution of the DMC. Plaintiff argues that he had the "exclusive righ[t]" to distribute DMC, which indisputedly was intended to be distributed as a "free" tourism magazine for public consumption.  (Doc. 1, at 113.)  Plaintiff contends that this "exclusive righ[t]" to distribute allowed him to restrain the disposition of DMC by dictating the terms of all subsequent transfers of the magazine. Citing 17 U.S.C. § 106, Plaintiff alleges that the Millard County Defendants (including both past and present employees), have violated his "exclusive righ[t] to . . . distribute copies of the copyrighted work to the public."  (Doc. 1, at 113.)  Plaintiff

argues that if he cannot control the distribution of the DMC, then his advertising revenues will be harmed.

Plaintiff's copyright infringement claim appears to be based mainly upon his allegations that (1) on August 22, 2007, Millard County took possession of 60,000 copies of DMC; (2) on August 24, 2007, Plaintiff wrote a letter to Millard County Commissioner Smith declaring that he still retained all rights to ownership and distribution of those copies of DMC, that he had only given Millard County permission to store and physically deliver the copies of DMC in their possession publication, and instructed Commissioner Smith as to how Plaintiff wanted the copies of DMC distributed; and (3) Defendants Gillmore, Haveron, and the MCTC ignored Plaintiff's distribution instructions and devised their own distribution scheme calculated to slow down distribution to make Millard County's copies of DMC last longer.  Plaintiff does not argue that the Millard County Defendants intended to disseminate DMC to unintended recipients, and Plaintiff has presented the court with no evidence that the distribution was somehow improper.  Instead, Plaintiff argues that the defendants' distribution might be too slow, it might be intended to make the magazine last for more than a year, it might prevent him from republishing the same magazine with different ads the following year, and it might mean Millard County would not order and pay for his magazine.

Having carefully considered Plaintiff's argument, the court concludes that it lacks merit because, as to the Millard County Defendants, Plaintiff's copyright claim fails because of the first sale doctrine and the fair use defense.

## A.  First Sale

The Millard County Defendants argue that even if Plaintiff had a valid copyright in DMC, they did not infringe on that copyright because of the first sale doctrine.

"Those who resell genuine trademarked products are generally not liable for trademark infringement." *Beltronics USA, Inc. v. Midwest Inventory Distribution, LLC*, 562 F.3d 1067, 1071 (10th Cir. 2009).  The reason for that lack of liability "'is that trademark law is designed to prevent sellers from confusing or deceiving consumers about the origin or make of a product, which confusion ordinarily does not exist when a genuine article bearing a true mark is sold.'" *Id.* (quoting *NEC Elecs. v. CAL Circuit Abco*, 810 F.2d 1506, 1509 (9th Cir. 1987) (citing *Prestonettes, Inc. v. Coty*, 264 U.S. 359, 368-69 (1924))); *see also United States v. Giles*, 213 F.3d 1247, 1252 (10th Cir. 2000) ("'[T]he purpose of trademark law is . . . to guarantee that every item sold under a trademark is the genuine trademarked product, and not a substitute.'" (quoting *Gen. Elec. Co. v. Speicher*, 877 F.2d 531, 534 (7th Cir. 1989))).  Thus, under the "first sale" doctrine, "'the right of a producer to control distribution of its trademarked product does not extend beyond

the first sale of the product.'" *Beltronics USA*, 562 F.3d at 1072
(quoting *Australian Gold Inc. v. Hatfield,* 436 F.3d 1228, 1240-41
(10th Cir. 2006) (quotations omitted)*; see also* 17 U.S.C. §
109(a).

In this case, Plaintiff made the threshold decision to
publish DMC, which was intended to be distributed to the public
for free.  Millard County paid Plaintiff for copies of DMC.
Plaintiff also received all the advertising revenue.  Once it
received the copies of DMC, Millard County did not sell these
copies; instead, it controlled their distribution.  Under the
first sale doctrine, Millard County was entitled to control
distribution of the copies of DMC it had purchased from
Plaintiff.  Further, once someone received a single copy, that
person could redistribute it, or collect copies and redistribute
them at a later time without violating Plaintiff's copyright.

Plaintiff tries to overcome the first sale doctrine by
arguing that Millard County "sponsored" rather than "purchased"
copies of DMC, and that Millard County's payment of Plaintiff's
costs and expenses associated with the publication, without
benefit of any receipts, was simply part of that sponsorship.
Plaintiff argues that all those who advertized in DMC were
"sponsors," and that Millard County, which also advertized in
DMC, was simply another sponsor.

The problem with Plaintiff's argument is that Millard County
did not pay for the costs and expenses of DMC through

advertising.  Instead, Plaintiff charged Millard County for advertising space separately from what he charged it to "purchase" copies of DMC.  (Doc. 33, Ex. 40 (Invoices and County Checks for Advertising in DMC).)  Plaintiff's purchase agreement with Millard County sets forth the terms of how the county would obtain copies of DMC so it could distribute them.  The evidence presented to the court supports that Plaintiff sold or transferred his property right in DMC to Millard County (i.e. Millard County "purchased" copies of DMC).  (Doc. 33, Exs. 11; 12; 21, at 4-5; 23, at 2-3; 25, at 7; 29; 30.)[8]

Therefore, Plaintiff's characterization of Millard County's payment of thousands of dollars for DMC as a "sponsorship" rather than a purchase is not supported by the facts presented to the court, and the court concludes that it lacks merit.

---

[8]It appears that Plaintiff's demand that he control distribution was not intended to preserve his creative work, but to force Millard County to continue to pay him for the same magazine over and over again.  As Plaintiff noted in his complaint, he was "eagerly eyeing" the TRT funds to help fund his tourism ideas.  (Doc. 1, at 96.)

Further, the evidence presented to the court does not support that Plaintiff's losses were associated with the Millard County Defendants' distribution of DMC.  Plaintiff's letter to Commissioner Smith is dated August 14, 2007.  (Doc. 35-3.)  In that letter Plaintiff alleges that if Millard County "makes it impossible for us to publish the DMC this Spring, it will greatly damage us . . . and I will seek redress for all associated damages."  (*Id.*)  Within a week of writing that letter, Plaintiff closed his business and relocated.  (Doc. 1, at 90.)  In fact, Plaintiff placed his business and home up for sale before he even wrote the August 24, 2007 letter to Commissioner Smith.  (Doc. 33, Ex. 35.)

In conclusion, the first sale doctrine allowed the Millard County Defendants to distribute the copies of DMC as they saw fit after they purchased them from Plaintiff.

**Fair Use**

Second, the Millard County Defendants also challenge Plaintiff's copyright infringement claim by invoking the fair use defense. The fair use defense is one of the "copyright's built-in First Amendment accommodations," protecting the public's First Amendment interest in copyrighted works. *Eldred v. Ashcroft*, 537 U.S. 186, 219-20 (2003). The fair use defense allows individuals to use expressions contained in a copyrighted work under certain circumstances, including 'criticism, comment, news reporting, teaching . . ., scholarship, or research . . . and even for parody.'" *Golan v. Holder*, 609 F.3d 1076, 1091 (10th Cir. 2010) (quoting *Eldred*, 537 U.S. at 219-20). The fair use doctrine is predicated on implied consent to "reasonable and customary" use of the product, once it has been published or released for public consumption. *See Harper & Row*, 471 U.S. at 550-51.

Section 107 of the Copyright Act lists the following factors to consider in determining "fair use":

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
> (2) the nature of the copyrighted work;
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

> (4) the effect of the use upon the potential
> market value for or value of the copyrighted
> work.

17 U.S.C. § 107.

These factors all support a finding of fair use.  The purpose and character of the use of DMC was to promote tourism, whether distributed by Plaintiff or by the defendants.  The magazine was published by Plaintiff; he made the threshold decision to release the creative work for free public consumption.  Indeed, he had previously published the same magazine in 2006.

DMC was distributed with Plaintiff given all credit for its contents.  Defendants made no profit and obtained no commercial value from DMC other than that intended by Plaintiff - the potential tourism value.  Plaintiff received all commercial value from the advertising.[9]  Millard County paid Plaintiff for both the copies of DMC it purchased and again for the numerous advertisements it placed in DMC.  Plaintiff also obtained revenue from the other advertising in DMC.  The Millard County Defendants' use of DMC was "fair use" and did not violate the Copyright Act.

---

[9]The court notes that from the Plaintiff's own commentary of events, Plaintiff publically announced he was going out of business on August 20, 2007, only four months after receiving payment for DMC in the amount of $24,700.  (Doc. 33, Ex. 6 (invoice and signed purchase agreement), Doc. 33, Ex. 34 (correspondence dated August 20, 2007), and Doc. 33, Ex. 35 (photocopy of Notice).)

The court concludes that Plaintiff's copyright claim against the Millard County Defendants fails as a matter of law.

## 2. State Claims

Because the court concludes that Plaintiff's only federal claim fails, the court may choose to decline exercising jurisdiction over Plaintiff's four state claims. Nevertheless, in case the court chooses to exercise jurisdiction over Plaintiff's state claims, the court next addresses each of them as to the Millard County Defendants.

The Millard County Defendants argue that the court lacks jurisdiction over some of the claims or defendants, and that each of Plaintiff's state claims fails on its merits.

### a. Governmental Immunity Act

The court first addresses the Millard County Defendants' argument that some of Plaintiff's state claims are barred because Plaintiff did not comply with the Governmental Immunity Act's requirements.

#### i. Second, Third, and Fourth Causes of Action Against Millard County

As did the Utah Tourism Defendants, the Millard County Defendants argue that Plaintiff's second, third, and fourth causes of action are barred because Plaintiff failed to comply with the Governmental Immunity Act.

As discussed in detail above, the Governmental Immunity Act requires that "[a]ny person having a claim against a governmental

entity . . . shall file a written notice of claim with the entity before maintaining an action." Utah Code Ann. § 63G-7-401(2). The notice requirements of the Governmental Immunity Act must be strictly followed, and the timely and proper filing of a notice is a jurisdictional prerequisite to suit. *See Suazo*, 168 P.3d at 342. The act requires that the notice of claim be filed within one year of the date the claim arises. The act also requires that the notice of claim shall be "directed and delivered by hand or by mail according to the requirements of Section 68-3-8.5 to the office of the county clerk, when the claim is against a county . . . [or to] the agent authorized by a governmental entity to receive the notice of claim by the governmental entity under Subsection 5(e)." Utah Code Ann. § 63G-7-401(3)(b)(ii)(B) & (G).

A notice of claim must set forth a "brief statement of the facts of his claim," "the nature of the claim asserted," "the damages incurred so far as they are known," and the name of the employee, if applicable. Utah Code Ann. § 63G-7-401(3)(a). A letter threatening redress in the courts is not enough to constitute a notice of claim; the notice of claim must contain all the required elements and be filed within the year deadline.

Plaintiff has not presented the court with evidence that he directed and delivered a timely and proper notice of claim to any of the Millard County Defendants. Although Plaintiff argues that he promptly notified Commissioner Daron Sith and Millard County

Attorney Richard Waddingham of his claims, the letters he attaches as exhibits to his memorandum opposing the Millard County Defendants' motion (Docs. 35-2 (8-24-07 Letter to Daron Smith), 35-3 (11-17-09 Letter to Richard Waddingham)) were either not filed within one year of his claim arising, or do not contain the required elements of a notice of claim. This defect cannot be cured because the deadline to file the notice of claim has passed for all state claims, as discussed in detail above. Therefore, the court lacks jurisdiction over Plaintiff's second, third, and fourth causes of action as to Millard County because they are barred by the Governmental Immunity Act. As a result, those claims should be dismissed as to Millard County.

### ii. *State Law Claims Against Millard County Employees*

Again as did the Utah Tourism Defendants, the Millard County Defendants also argue that all of Plaintiff's state law claims as to the Millard County Defendants are barred by the Governmental Immunity Act. As discussed in detail above, the Governmental Immunity Act requires that Plaintiff file a timely notice of claim and a complaint alleging facts from which a fact finder could reasonably infer that the Millard County employees acted through fraud or willful misconduct. *See Straley*, 997 P.2d at 341-42. No evidence or allegation has been presented to the court supporting that Plaintiff filed such a timely notice of claim. As a result, this court lacks subject matter jurisdiction over the state claims brought against the Millard County

employees, and those claims should be dismissed as to those employees.

## b.  Civil Conspiracy

Next, the court addresses the Millard County Defendants' challenge to Plaintiff's civil conspiracy claim.  As it did with the Utah Tourism Defendants, in addressing the Millard County Defendants' challenge to this claim, the court follows the civil conspiracy analysis set forth above regarding the Utah.com Defendants.

Plaintiff's claim of copyright infringement appears to be the underlying tort upon which Plaintiff bases his civil conspiracy claim.  Because the court concludes that Plaintiff's complaint fails to state a valid copyright infringement claim as to Millard County, the court concludes that Plaintiff's civil conspiracy claim fails because it lacks a valid underlying tort claim.  *See Jackson*, 462 F.3d at 1238 (citing *Alta Indus.*, 846 P.2d at 1290 n.17) (explaining that "[u]nder Utah law, civil conspiracy requires, as one of its essential elements, an underlying tort" and finding that plaintiffs were barred from further litigation of their conspiracy claim because the underlying tort claims were dismissed with prejudice).  Thus, Plaintiff's civil conspiracy claim as to the Millard County Defendants should be dismissed.

### c. Theft/Theft by Extortion

Plaintiff's claim for theft and theft by extortion as to the Millard County Defendants fails for the same reasons it fails as to the Utah.com and the Utah Tourism Defendants, discussed above.

### d. Loss of Consortium

Similarly, Plaintiff's loss of consortium claim as to the Millard County Defendants fails for the same reason it fails as to the Utah.com and the Utah Tourism Defendants, discussed above.

### e. Breach of Contract

Finally, the Millard County Defendants argue that their alleged contract with Plaintiff (1) violates Utah's Statute of Frauds, (2) fails because its lacks both a mutual promise and consideration, and (3) is barred by the applicable statue of limitations.

### i. Statute of Frauds

First, the court addresses the Millard County Defendants' argument that Plaintiff's breach of contract claim violates Utah's Statute of Frauds. Utah's Statute of Frauds provides that an agreement that, by its own terms, will not be performed within one year, is void unless the agreement, or some note or memorandum of the agreement, is in writing and signed by the party to be charged with the agreement. *See* Utah Code Ann. § 25-5-4(1)(a).

Plaintiff contends that the contract he had with Millard County arose at least seventeen years ago, and perhaps even

earlier.  The court concludes that the alleged oral contract does

violate Utah's Statute of Frauds.  First, no written document

setting forth the terms Plaintiff alleges from that early

contract has been presented to the court, and no one alleges that

such a document ever existed or was executed.  Second, obviously

Millard County did not sign the nonexistent written document.  No

such signature or allegation of such a signature has been

presented to the court.  Third, by the very terms relied upon by

Plaintiff, the alleged contract was incapable of being performed

within a year.[10]  Thus, based on the undisputed facts, the alleged

contract, as described by Plaintiff himself, violates the Statute

of Frauds, and therefore is unenforceable.  *See Coulter & Smith,*

*Ltd. v. Russell*, 976 1218, 1222 (Utah Ct. App. 1999).

### ii.  *Mutual Promise and Consideration*

The Millard County Defendants also challenge Plaintiff's

breach of contract claim by arguing the alleged contract lacked

both a mutual promise and consideration.  Utah law dictates that

the formation of a contract "requires a bargain in which there is

a manifestation of mutual assent to the exchange and

consideration."  *Aquagen Intern., Inc. v. Calrae Trust*, 972 P.2d

411, 412 (Utah 1998) (quoting Restatement (Second) of Contracts,

---

[10]Further, the court notes that, from the information
presented to the court, it appears that the contract's terms were
too ambiguous and vague to be enforceable.  The contract
allegedly mandated that Millard County reorder an unknown number
of magazines from year to year, and commit taxes not yet
collected to pay for those magazines.

§ 17(1) (1981)).  Consideration sufficient to support the
formation of a contract requires that "a performance or a return
promise must be bargained for."  *Id.*  If there are no conflicting
issues of fact, the existence of a contract is a conclusion of
law.  *Media News Group, Inc. v. McCarthey*, 432 F.Supp.2d 1213,
1219 (D. Utah 2006).

The court also concludes that a long-term "implied contract"
was not formed because the alleged promises were nothing more
than vague assurances.  *See Krause v. Dresser Indus., Inc.*, 910
F.2d 674, 678 (10th Cir.1990) (in order to create implied
contract, promises must be definite); *Dupree v. United Parcel
Service, Inc.*, 956 F.2d 219, 222 (10 Cir. 1992); *New York Life
Ins. th Co. v. K N Energy, Inc.*, 80 F.3d 405, 412 (10th Cir.
1996) ("there must be a meeting of the minds before any contract
will be implied, although contracts can be based on the parties'
conduct, and thus implied in fact).  At times, Plaintiff did not
comply with his alleged responsibilities under the contract;
during those times, Millard County proceeded without Plaintiff,
including maintaining storage and distribution of DMC.  Each time
DMC was revised, reprinted, or reordered, the number of copies
requested and expenses changed.  The MCTC frequently discussed
and explored its options regarding tourism magazines.  In other
words, evidence has not been presented to the court showing that
the alleged contract involved any definite terms or promises upon

which the parties could rely. *See Uhrhahn Const. & Design, Inc. v. Hopkins*, 179 P.3d 808, 815-16 (Utah Ct. App. 2008).[11]

### iii. *Statute of Limitations*

The Millard County Defendants also dispute Plaintiff's breach of contract claim by arguing that it is barred by the applicable statute of limitations. The Utah Code requires that an action "upon a contract, obligation, or liability not founded upon an instrument in writing" must be brought within four years. Utah Code Ann. § 78B-2-307(1)(a); *see also State v. Huntington-Cleveland Irrigation Co.*, 52 P.3d 1257, 1262 (Utah 2002).

According to the facts presented by Plaintiff, on July 13, 2005, the MCTC informed him that it would not promise him an annual order and that he would be required to submit a bid for the project. Thus, the oral contract allegedly entered into in 1993[12] was breached in 2005. Therefore, relying upon Plaintiff's

---

[11]In April 2006, Millard County and Plaintiff did enter into a contract. At that time, Plaintiff signed the purchase agreement and the defendants agreed to pay a sum of $24,700.00 for 40,000 copies of the DMC, with the additional stipulation that the magazines be received by May 15, 2006. (Doc. 33, Ex. 6 (4-12-06 MCTC Minutes), at 3-5; Doc. 33, Ex. 28 (Purchase Agreement).) Plaintiff was unable to comply with the contract's terms, and the parties modified the contract to extend the delivery to June 15, 2006. (*Id.*) In 2007, Plaintiff reprinted the magazine, pursuant to the sole source agreement in 2006, and the reprinted copies were delivered on August 10, 2007. Thus, the contract, by its own terms, was completed on August 10, 2007.

[12]Plaintiff alleges that the parties entered into an oral contract in approximately 1993 or 1994. This fact is derived from Plaintiff's assertion that it was at that point in time that

claims and factual allegations, the statute of limitations began to run, at the latest, on July 13, 2005, when he was informed there would be no annual order.  Consequently, Plaintiff's claim for breach of an oral contract by the Millard County Defendants is untimely and should be dismissed.

In summary, the court concludes that the Millard County Defendants' summary judgment motion should be granted because no genuine dispute as to a material fact exists and because the Millard County Defendants are entitled to judgment as a matter of law.

## RECOMMENDATION

Based on the analysis above, **IT IS RECOMMENDED** that the court **GRANT** the Utah.com Defendants' motion to dismiss (Doc. 6), the Utah Tourism Defendants' motion to dismiss (Docs. 9 & 23), and the Millard County Defendants' motion to dismiss/for summary judgment (Doc. 32).

Copies of the foregoing Report and Recommendation are being mailed to the parties who are hereby notified of their right to object to the same.  The parties are further notified that they must file any objections to the Report and Recommendation, with

---

he required a long-term commitment from Millard County to generate "reliable advertising revenue," or Plaintiff would prefer to "go it alone."  (Doc. 1, at 9-10.)  Regardless of whether the long-term commitment was entered into in 1993 or 1994, the statute of limitations expired before Plaintiff filed his complaint, barring Plaintiff's breach of contract claim.

the clerk of the district court, pursuant to 28 U.S.C. § 636(b), within fourteen (14) days after receiving it.  Failure to file objections may constitute a waiver of those objections on subsequent appellate review.

DATED this 24th day of August, 2011.

BY THE COURT:

_____
Samuel Alba
United States Magistrate Judge